CORNELIO DE LA CRUZ SALES, J.R,
c/o MICHELLE HEALEY
1739-A SAPLING COURT
CONCORD, CA 94519
**PRO SE**



# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

Cornelio Sales,

      Petitioner,

Vs.


JEH CHARLES JOHNSON, Secretary
of the United States Department of Homeland
Security; LORETTA LYNCH, Attorney
General of the United States; MICHAEL
VAUGHN, Sacramento Field Office Director,
Office of Enforcement and Removal Operations,
U.S. Immigration and Customs Enforcement,
SCOTT JONES, Sheriff of Sacramento County
Sheriff's Department and Rio Cosumnes
Correctional Center,

      Respondents.

CASE NO.: **C16- 1745**

**Agency NO. A-029-556-125**

**PETITION FOR WRIT OF
HABEAS CORPUS
PURSUANT TO 28 U.S.C. 2241**

## Introduction

1.    Petitioner[1] has spent a collective 14-months in immigration detention not

including his prior incarceration of 235-months in the California Department of Corrections and

Rehabilitation. Under Ninth Circuit precedent, prolonged detention has been held

unconstitutional and where the detainee is challenging the very notion that he is removable,

detention is only permissible where removal is "expeditious." Petitioner's removal proceedings

---

[1]  Petitioner is also referred to in this Writ of Habeas as Respondent in his removal and bond hearings.

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

are currently before the Ninth Circuit pending judicial review. Petitioner is a lawful permanent resident, was convicted of Second-Degree murder under California's aiding and abetting accomplice liability extension. Petitioner had a *Rodriguez v. Robbins,* 715 F.3d 1127 (9th Cir. 2013) hearing on March 25, 2015, in which petitioner was denied bond. Petitioner asserts that the court erred in denying bond and that the government did not meet the burden in proving that petitioner is a flight risk. Petitioner asserts in his petition for review in the Ninth Circuit Court of Appeals that the manner of his conviction does not establish under Federal statutes that, it qualifies as an aggravated felony, and petitioner is therefore neither removable nor subject to mandatory detention under the immigration statutes.

## Custody

2.      Petitioner is in the physical custody of Respondents and the Department of Homeland Security (DHS), United States Immigration and Customs Enforcement (ICE). Petitioner is detained at Sacramento County Rio Cosumnes Correctional Center in Elk Grove, California. Petitioner is under the direct control of Petitioners and their agents.

## Jurisdiction

3.      This action arises under the Constitution of the United States and the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq., and the Administrative Procedure ACT ("APA"), 5 U.S.C. § 701, et seq.

4.      This court has jurisdiction under 28 U.S.C. § 2241; Art. I, § 9, cl. 2 of the United States Constitution (Suspension Clause) and 28 U.S.C. § 1331, as Petitioner is presently in custody under color of authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States. This court may grant relief pursuant to 28 U.S.C. §2241, 5 U.S.C. § 702, and the All Writs Act, 28 U.S.C. § 1651.

## Parties

5.      Petitioner  is a native and citizen of the Philippines, and is a lawful permanent resident of the United States. During his pendency of immigration removal proceedings against him, he has spent collectively over 14-months in immigration custody.

6.      Respondent, Jeh Charles Johnson is the Secretary of the Department of Homeland Security. He is responsible for the implementation and enforcement of the Immigration and Nationality Act (INA) and oversees U.S. Immigration and Customs Enforcement (ICE). Mr.

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

Johnson has ultimate custodial authority over Petitioner.

7.      Respondent, Loretta Lynch is the Attorney General of the United States. She is responsible for the implementation and enforcement of the INA, and oversees the Executive Office for Immigration Review (EOIR), which is comprised of the Office of the Immigration Judge and the Board of Immigration Appeals (BIA or "Board"), the office which gave the final administrative order of removal.

8.      Respondent, Michael Vaughn is the Field Director of the Sacramento Field office of the Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, Department of Homeland Security. As such, respondent Vaughn is Petitioner's legal custodian, charged with the responsibility of determining whether Petitioner will be detained in ICE custody or released pending the conclusion of immigration removal proceedings.

9.      Respondent, Scott Jones is the Sheriff of Sacramento County, California, and is in charge of the Rio Cosumnes Correctional Center Immigration Detention Facility. As such, he is also Petitioner's immediate custodian.

### Factual Allegations

10.     Petitioner is a 39-year old legal permanent resident. He was born in the Philippines and has resided in the United States since the age of five. Petitioner legally entered the United States as a military dependent, and adjusted to legal permanent status in 1989. In 1995, Petitioner a senior in high school was convicted of second degree murder in the state of California in violation of penal code 187, as an aider and abettor under the natural and probable consequence doctrine. Petitioner was sentenced and sent to state prison with a 16-to life sentence.

11.     On September 18, 2014, after having served 19-plus years of his 16-years to life sentence, petitioner was found suitable by the parole board and the Governor of the state of California approved petitioner's parole suitability and was ultimately released.[2]  Petitioner was immediately transferred to ICE custody where he remains detained today. Petitioner has been detained for over 14-months and his case is currently pending a petition for review in the Ninth Circuit Court of Appeals where removal is not likely in the near future.

---

[2]  This release was only made possible through a review process in which grants are affirmed, denied, or modified and ultimately forwarded to the state governor for final review and approval.

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

12.    On November 24, 2014, the Immigration Judge (IJ) sustained the allegations on the Notice to Appear (NTA) and ordered Petitioner removed to the Philippines.

13.    On December 18, 2014, Petitioner appealed the IJ's decision of removability to the Board of Immigration Appeals.

14.    On March 18, 2015, the Board of Immigration Appeals (BIA) dismissed Petitioner's appeal contesting removal and concurred with the IJ's decision and stated that Petitioner's arguments were *"unpersuasive"*.

15.    On March 25, 2015, after having been detained for six months petitioner received a bond hearing pursuant to *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013). At this hearing, petitioner provided many years' worth of supporting documents ranging from certificates in education, vocations, rehabilitation and self-help programs that has earned petitioner a second chance and a release from prison through the governor of the state of California. Petitioner also presented psychological evaluations dating as far back as 2007 deeming petitioner a low risk for future propensity for violence and recidivism. Petitioner's wife and close friend testified on his behalf that supports release on bond. Additionally, petitioner had also presented supporting letters from his father, a retired United States Navy Seaman, his mother as well as his two siblings.   At the end of the hearing, the IJ stated that he will carry out a reserved decision and stated that a decision would be made in a couple of days. **See Exhibit I Bond Hearing Transcripts) pages 11 & 13.**

16.    On March 27, 2015, the IJ carried out a reserved decision in absentia and denied bond stating on the memorandum no reasons other than, "Petitioner is ordered detained." **See Exhibit II (Bond Hearing Decision Dated March 27, 2015).**

17.    On April 3, 2015, Petitioner filed a motion to reconsider bond with the IJ. In this motion, petitioner asserts that the IJ incorrectly ruled to deny bond without informing the petitioner as to the reasons for denial. Petitioner also asserts in this motion that the government clearly did not meet the burden in establishing that petitioner is a flight risk and or a danger. **See Exhibit III (Motion to Reconsider Bond Dated April 3, 2015).**

18.    On April 15, 2015, Petitioner's motion to reconsider bond was denied stating in the IJ's memorandum that reasons for denial will only be issued if and when the summary decision is appealed to the BIA. In this order, the IJ asserts that if and *only if* petitioner seeks to

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

appeal the decision will the reasons for denial be disclosed. **See Exhibit IV (Memorandum Denying Motion to Reconsider Bond Dated April 15, 2015).**

19.     On April 23, 2015, Petitioner filed an appeal with the BIA contesting the IJ's bond decision. Petitioner asserts in the appeal that his due process rights were violated due to his unjustified continued detention. **See Exhibit V (Board of Immigration Bond Appeal Dated April 23, 2015).**

20.     On April 28, 2015, following an appeal to the BIA by the Petitioner, the IJ ultimately issued a memorandum for his reasons in denying bond. **See Exhibit VI (Memorandum Denying Bond: With reasons stated pertaining to BIA appeal Dated April 28, 2015).**

21.     On March 23, 2015, Petitioner filed a petition for review in the Ninth Circuit Court of Appeals in regards to the IJ's sustained decision in ordering the Petitioner removed.

22.     On March 23, 2015, Petitioner also filed a motion to stay removal pending judicial review.

23.     On April 12, 2015, Petitioner filed a motion for pro bono counsel in the Ninth Circuit court of appeals.

24.     On September 17, 2015, Petitioner's BIA bond appeal was dismissed stating that the BIA agrees with the IJ's determination that the Department of Homeland Security established by clear and convincing evidence that the Petitioner's continued detention is justified. See **Exhibit VII (BIA Bond Appeal Decision Dated September 17, 2015).**

25.     On September 18, 2015, the Ninth Circuit Court of Appeals granted petitioner's motion for stay, motion for pro bono counsel, and denied the government's motions to deny the Petitioner's petition for lack of jurisdiction and to deny Petitioner's motion to stay. This is a material change in circumstance and should be greatly considered. In the Ninth Circuit's September 18, 2015 order, it states, "…questions raised by this petition for review are sufficiently substantial to warrant further consideration by a merits panel." **See Exhibit VIII (Ninth Circuit Court of Appeals-Order Dated September 18, 2015).**

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

## Claims for Relief

### I. STATUTORY VIOLATION

26.     Petitioner re-alleges and incorporates by reference paragraphs 1 through 25, above.

27.     Respondent's (referred to in paragraphs 7-10) continued detention of Petitioner is unlawful and contravenes 8 U.S.C. § 1231(a), as interpreted by the Supreme Court in *Zadvydas*, and *Clark V. Martinez*, 543 U.S. 371 (2005), and 8 U.S.C. § 1226 (c) pursuant to the Ninth Circuit holdings in *Tijani* and *Nadarajah*. Petitioner has not been removed and he continues to languish in detention. He has been detained for over 15-months, well over the presumptively reasonable period of six months and statutorily permitted ninety-day period for ordinary circumstances. Petitioner's removal to the Philippines is not significantly likely to occur in the reasonably foreseeable future. Accordingly, respondent's continued detention of petitioner is unjustified and unconstitutional.

28.     Petitioner asserts that the IJ and the Board clearly violated his rights during his March 25, 2015 bond hearing when the IJ made a statement that he was the one who had ordered respondent removed and noted respondent's failed attempt to appeal his decision to the Board of Immigration Appeals (BIA). **See Exhibit I page 2.** "Regardless of the stage of the proceedings, the same important interest is at stake-freedom from prolonged detention." *Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2011). The IJ made it clear that petitioner's chances of being released on bond were slim to none based on this statement alone. Petitioner did not appear before a neutral decision maker and a conflict of interest is clearly present as evidenced on record. Furthermore, although petitioner had been ordered removed by a final administrative order, in *Singh v. Holder*, 638 F. 3d 1196, 1197 (9th Cir. 2011) the court states, "Although this is a relevant factor in the calculus, it alone does not constitute clear and convincing evidence that Singh presented a flight risk justifying denial of bond." Id. at 5. This statement made by the IJ is clearly indicative that the he was not in the position as a neutral decision maker and should have excused himself in the proceedings. In fact, as long as a petitioner is seeking judicial review and goes before the same IJ that had previously ordered removal will almost never receive a fair and just hearing. Petitioner is seeking judicial review of his removal order in which the Ninth Circuit Court of Appeals has

stated that issues raised on the petition of review warrants a review by a merits panel. With that said, it is clear that there is a potential for a success in merits and therefore should be seriously considered in granting bond.

29.     Petitioner asserts that his due process rights have been violated during his bond hearing. Petitioner was not given *an individualized assessment* and the IJ's statements were indicative that he had decided to deny petitioner bond before the hearing had even concluded. This is clearly erroneous on the part of the IJ and an abuse in discretion. Furthermore, the IJ's statement in regards to petitioner's length of residence in this country, "…his desire to remain in the United States, and his family ties, tell us little, if anything, about whether he is likely to report for removal. Indeed these facts give him every incentive to avoid reporting for removal, because reporting for removal will permanently sever his connection to his family and this country." Petitioner asserts that is quite the contrary. Petitioner is not afraid to return to the Philippines. He did not apply for Convention against Torture or asylum because he does not fear returning to his country of birth.   In fact, in the event that petitioner is ordered removed by the circuit court, his family will visit occasionally to maintain family ties. Petitioner reiterates that he has presented evidence in reassuring that he would not be a flight risk and would in fact have every incentive to show up on deportation day. Petitioner had assured the IJ that all evidence points to petitioner being a good bail risk.   **See Exhibit VI-Memorandum Denying Bond page 3.**

30.     The petitioner asserts that the IJ erred in stipulating that having family ties gives him the incentive to be of non-appearance. The IJ and BIA clearly erred with this misinterpretation due to the fact that these are positive factors towards a granting of release on bond. *Guerra* 24 I&N Dec. 37 (BIA 2006). In addition to family ties are significant in regards to considering bond. As a matter of fact, in *Zadvydas* U.S. 678 S. Ct. 2491, it specifies "family ties" as a "favorable factor" in considering an alien's release. Id at 683. Contrary to the IJ's views, this favorable factor clearly puts petitioner in the good bail risk category. The IJ and the BIA clearly erred in turning positive *Guerra* factors in to negative factors. *Guerra* at 40.

31.     Petitioner asserts that it is quite the contrary. Petitioner, a parolee from the California Department of Corrections is subject to parole for a period of life in which after five years he then can petition for pardon from parole supervision. These parole conditions range

Petition for Writ of Habeas Corpus

from but are not limited to; routine check-ins and drug testing, unexpected visits by the parole officer or any other agencies and mandated to attend Alcoholics Anonymous workshops. Failure to do so will result in a parole violation in which respondent is subject to having his life sentence reinstated. In such scenarios, logics would clearly point to the direction in which full compliance would be in his best interest.

32.     Petitioner also asserts that the IJ and the BIA erred when after weighing all the factors came to the deduction that he was a flight risk.   Petitioner asserts that in the same evidence in which the IJ and the BIA's decision derived from, is clearly and convincingly devoid of any indications or implications that petitioner would be in fact be either a danger and or a flight risk. In this memorandum, **See Exhibit VI,** the IJ states:

> "Respondent has not failed to appear for any criminal or immigration proceedings, but that is because he has been continuously in custody since his 1995 murder conviction." Id. at _____

33.     However, the IJ and the BIA relied on this scenario as to what could happen but didn't happen in regards to why the petitioner has not had a failure to appear for any criminal or immigration proceedings.   This is erroneous on the part of the IJ to introduce evidence which has absolutely no material substance and the BIA erred in affirming the decision of the IJ in regards to this specific factor in denying bond.

34.     These statements are based on a fabricated hypothetical scenario which are not facts but rather speculations that cannot seriously be considered aggravating factors to deny respondent bond. If anything, having a history of no escapes, failures to appear for immigration or other proceedings, and other obligations are rather *mitigating* factors. *Guerra* factor number five.

35.     Furthermore, petitioner has no such history of nonappearances which clearly puts him in the category for being a good bail risk. In *Singh v. Holder,* 638 F. 3d 1196, 1197 (9th Cir. 2011) the court states, "The Supreme Court, however, 'repeatedly has recognized that civil commitment for *any* purpose constitutes a significant deprivation of liberty, '*Addington,* 441 U.S. at 425, 427, 99 S. Ct. 1804 (emphasis added) (concluding that the individual's interests

Petition for Writ of Habeas Corpus

were 'of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence.'"). Id. at 4.

36.     Petitioner asserts that the IJ erred in concluding that the government met the burden in justifying continued detention. **(See Exhibit VI)** Contrary to the IJ's statement, Petitioner asserts that the Government *did not meet* the burden required by the *Rodriguez* court in justifying continued detention. In this memorandum, the IJ stated:

> "The government bears the burden in this proceeding to show by clear and convincing evidence that the respondent is a danger to the community, a risk of nonappearance, or both." Id. Furthermore, the IJ also stated,

> "The court finds that, under the specific facts of this case, the government has met its burden to show by clear and convincing evidence that respondent is a risk of flight and nonappearance, and that no combination of conditions will reasonably assure his future appearance."   Id.

37.     The bond hearing transcripts are clearly devoid of clear and convincing evidence that such a burden was met. There were no questions asked or concerns raised during this hearing.  In *Rodriguez vs. Robbins*,… "at the conclusion of each bond hearing, the Immigration Judge ("IJ") 'shall release each Subclass member on reasonable conditions of supervision, including electronic monitoring if necessary, unless the government shows by clear and convincing evidence that continued detention is justified based on his or her danger to the community or risk of flight.'"  Id. 5. The record indicates that the government did meet the burden as required in *Rodriguez vs. Robbins*.

38.     Petitioner also asserts that the IJ and the BIA erred in denying bond and did not fully consider the nine factors set forth in *Matter of Guerra*, [24 I.N. Dec. 37, 40 (B.I.A. 2006)] 534 F.3d at 1065-66. *Guerra* discusses nine factors that, Immigration judges may look to…"in determining whether an alien merits release on bond, as well as the amount of bond that is appropriate. These factors may include any or all of the following: **(1)** whether the alien has a fixed address in the United States; **(2)** the alien's length of residence in the United States; **(3)** the

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; **(4)** the alien's employment history; **(5)** the alien's record of appearance in court; **(6)** the alien's criminal record, including the extensiveness of the offenses; **(7)** the alien's history of immigration violations; **(8)** any attempts by the alien to flee prosecution or otherwise escape from authorities; and **(9)** the alien's manner of entry to the United States." 24 I.N. Dec. at 40. In weighing all evidence in regards to factors that the IJ may look to, petitioner has satisfied not just any or the following but rather *all* nine areas of the *Guerra* factors. Petitioner has **(1)** a fixed residence with his wife and step-son; **(2)** petitioner has resided in the United States since 1982 as a military dependent and is a legal permanent resident; **(3)** petitioner has strong family ties: United States Citizen wife and son in northern California, father who is a naturalized retired Navy Seaman, mother and two siblings who are all legal permanent residents reside in southern California; **(4)** petitioner has held a position in California Prison Authority for 12-years as a certified optician manufacturing eyeglasses for agencies such as Department of Transportation, California Highway Patrol, and Medi-cal.; **(5)** petitioner has no record of any failures to appear; **(6)** petitioner has only his controlling offense as an adult that he was released from through the parole board and the governor of the state of California; **(7)** petitioner has no immigration violations; **(8)** petitioner has no attempts to flee prosecution or otherwise escape from authorities; and **(9)** petitioner entered the United States legally through his father as a military dependent. With the aforementioned above, it is fair to say that petitioner is in fact a very good bail risk contrary to the findings of the IJ and the BIA. As mentioned Petitioner would also be on state parole that would give him every incentive to show on removal day if so ordered.

39.     Petitioner asserts that the balance of equities tip towards petitioner being a good bail risk. Having considered all relevant factors and circumstances, petitioner was convicted of a crime, although serious, was released from state prison after having had to convince and reassure the parole board members that he was no longer a threat to society. Petitioner took the initiative and the opportunity to rehabilitate himself through programs that were offered in the prison system. These programs are strictly voluntary and petitioner has participated in numerous workshops to better himself and to fully prepare himself for release to the free society. See **Exhibit IX (Supporting documentations related to rehabilitation).**

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

40.     Petitioner did not have the luxury of sitting around during the duration of his lengthy prison sentence and being entitled to release. Petitioner had to go through a series of hearings and reviews to gauge petitioner's level of threat if released to the free society. Statistics show that parolees who were released after having served an indeterminate sentence were least likely to recidivate. In fact, petitioner's crime of murder second has the lowest three-year recidivism rate at 10.3 percent. **See Exhibit X (CALIFORNIA DEPARTMENT OF CORRECTIONS Outcome Evaluation Report-January 2014).**

41.     Per *Rodriguez v. Robbins* at 19, the court states, "As we held in *Casas*, the prolonged detention of an alien without an individualized determination of his dangerousness or flight risk would be constitutionally doubtful." 535 F. 3d at 951. The IJ stated in his memorandum no reasons as to the actual denial. There were no stipulated concerns in regards to petitioner's dangerousness or flight risk. This is not in accordance with what governs a *Rodriguez* bond hearing. In fact, at the March 25, 2015 bond hearing, the government had no questions for petitioner's witnesses that spoke up on his behalf. Furthermore there were no stipulated concerns on record in regards to petitioner's level of danger and or flight risk. In conclusion, the IJ erred in denying petitioner a reasonable bond and the BIA erred in affirming the IJ's decision. The government did not meet the burden in justifying continued detention and all evidence clearly points that petitioner is in fact a very good bail risk.

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

## **Prayer for Relief**

WHEREFORE, Petitioner prays that the court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Expedite consideration of this action pursuant to 28 U.S.C. §1657 because it is an action brought under chapter 153 (habeas corpus) of Title 28;

(3) Pursuant to 28 U.S.C §2243 issue an order directing respondents to show cause why the writ of habeas corpus should not be granted;

(4) Grant petitioner a writ of habeas corpus directing the respondents to immediately set a reasonable bond amount and or release petitioner from custody on electronic monitoring, or in the alternative, order that the petitioner be provided a custody redetermination hearing in accordance with *Rodriguez v. Robbins;*

(5) Award petitioner attorney fees and or appoint counsel;

(6) Grant any other and further relief as the court deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day ___April 6, 2016___

Respectfully Submitted,

Cornelio Dela Cruz Sales, Jr.
Petitioner
**Pro Se**

# EXHIBITS

I.     BOND HEARING TRANSCRIPTS

II.    BOND HEARING DECISION MEMORANDUM

III.   MOTION TO RECONSIDER BOND

IV.    MEMORANDUM DECISION DENYING MOTION TO RECONSIDER BOND

V.     BIA APPEAL FORM

VI.    MEMORANDUM DENYING BOND

VII.   BIA BOND APPEAL DISMISSAL

VIII.  NINTH CIRCUIT COURT OF APPEALS ORDER

IX.    CALIFORNIA DEPARTMENT OF CORRECTIONS OUTCOME EVALUATION
       REPORT

X.     SUPPORTING DOCUMENTATIONS RELATED TO REHABILITATION

Petition for Writ of Habeas Corpus

Agency No. A029-556-125

# Exhibit I.

# Bond Hearing transcripts

U.S. Department of Justice
Executive Office for Immigration Review
United States Immigration Court

In the Matter of                                    File:  A029-556-125

|  |  |  |
|---|---|---|
| CORNELIUS DELA CRUZ SALES | ) | IN BOND PROCEEDINGS |
|  | ) |  |
| RESPONDENT | ) | Transcript of Hearing |

Before ANTHONY S. MURRY, Immigration Judge

Date: March 25, 2015                    Place: SAN FRANCISCO, CALIFORNIA

Transcribed by DEPOSITION SERVICES, Inc.-2

Official Interpreter:

Language:

Appearances:

  For the Respondent: PRO SE

  For the DHS: JENNIFER CASTRO

1   JUDGE FOR THE RECORD

2         This is Immigration Judge Anthony Murray, San Francisco, California. It is

3   March 25, 2015. Rodriquez bond proceedings, A 029 556 125, respondent appearing

4   by VTC from Sacramento, California. Jennifer Castro, Assistant Chief Counsel here on

5   behalf of the Government. Respondent's spouse is here, she's given me an assembly

6   of documents related to respondent, really more related to his underlying criminal

7   proceeding, but a lot of it goes to the respondent's efforts to rehabilitate himself. The

8   Probation Office's finding, or the Parole Board I should say, finding that the respondent

9   was suitable for parole. In other matters, it's a substantial stack of documents. The

10  Government submitted the BIA's decision from a week ago dismissing the respondent's

11  appeal that had attached to it my decision. Also attached were the underlying

12  conviction documents for the respondent's 1995 homicide conviction.

13  JUDGE TO MR. SALES

14        Mr. Sales, is English or Spanish better for you?

15  MR. SALES TO JUDGE

16        English, Your Honor.

17  JUDGE TO MR. SALES

18        It's not Spanish. It's Philippines, right?

19  MS. CASTRO TO JUDGE

20        No, it's not.

21  JUDGE TO MR. SALES

22        Sorry. I apologize, Mr. Sales. I forgot, Philippines. But English is okay?

23  Not Tagalog?

24  MR. SALES TO JUDGE

25        Okay, it's fine. English is fine.

1   JUDGE TO MR. SALES

2           All right.  Mr. Sales, because you've been in custody 180 days, you're

3   entitled to a bond hearing, and the Government has the burden to prove that you're not

4   a danger to the community, you're not a risk of failure to appear, or otherwise a poor risk

5   to get bail.  You have an option -- you don't have an attorney today, correct?

6   MR. SALES TO JUDGE

7           Correct.

8   JUDGE TO MR. SALES

9           All right.  You got an option.  We can go forward with your bond hearing

10  today, or I can give you some time to see if you want to try to get an attorney.  The one

11  thing that I want to caution you about is that you are really only going to get, I mean as a

12  practical matter, a realistic matter, you're going to get one opportunity for bond.  And

13  obviously, as you know, release on bond is not automatic.  It's a situation in which you

14  were convicted of a very serious crime.  I've denied relief and ordered you deported.

15  The BIA has upheld that decision.  So if you want to go forward with your bond hearing

16  today, we most certainly can.  But it's your call.  If you'd like to even postpone this a little

17  bit and talk to your family and decide whether you're going to get an attorney, I can do

18  that.  Let me say one other thing, there's another advantage to that, it would give me an

19  opportunity to read the documents that your wife gave me today.  But it's up to you, if

20  you want to go forward today, I can do that.  You tell me.

21  MR. SALES TO JUDGE

22           Mr. Murray, is it possible to give the opinion, get my wife's opinion on that?

23  JUDGE TO MR. SALES

24           Sure.  As a matter of fact, what I can do is just I'll, let me go off the record,

25  and let her come up here and you two can talk while I do paper work.

1    MR. SALES TO JUDGE

2                I appreciate it.

3    JUDGE FOR THE RECORD

4                Off the record.

5                                    (OFF THE RECORD)

6                                    (ON THE RECORD)

7    JUDGE FOR THE RECORD

8                Back on the record.  We stood down to let the respondent and his spouse

9    talk about how they wanted to proceed.

10   JUDGE TO MR. SALES

11               Mr. Sales, you want me to go ahead with the bond hearing today?

12   MR. SALES TO JUDGE

13               Yes, sir.

14   JUDGE TO MR. SALES

15               All right.  Did you receive the fax that was sent out by the Government that

16   had the BIA decision, my decision, and your conviction documents?

17   MR. SALES TO JUDGE

18               Yes, I did.

19   JUDGE TO MR. SALES

20               There it is, I see you have it.  Okay, that's going to be Bond Exhibit 1.  And

21   then the documents your wife gave me today I'm going to make Bond Exhibit 2.

22   MR. SALES TO JUDGE

23               Okay.

24   JUDGE TO MR. SALES

25               Do you swear any statements you make will be the truth?

1   MR. SALES TO JUDGE

2           Yes.  Yes, I do.

3   JUDGE TO MR. SALES

4           Let me ask you some questions.

5   MR. SALES TO JUDGE

6           Yes, sir.

7   JUDGE TO MR. SALES

8           Q.    How old are you sir?

9           A.    38.

10          Q.    And you're married, obviously?

11          A.    Yes.

12          Q.    Do you have any children?

13          A.    I have one step-son.

14          Q.    How old is your step-son?

15          A.    14.

16          Q.    Do you own any property in this country, like a house or a

17   condominium?

18          A.    No, I do not.

19          Q.    Have you ever operated your own business in this country?

20          A.    No, I have not.

21          Q.    Do your parents have legal status in this country?

22          A.    Yes, they do.

23          Q.    Are they citizens or residents?

24          A.    My father is a U.S. citizen, naturalized citizen.  My mother is a,

25   she's a LPR.

| | | |
|---|---|---|
| 1 | Q. | How did you get your green card? |
| 2 | A. | My father, he readjusted his status in 1989 in San Francisco. |
| 3 | Q. | Where are your parents now?  Are they in the United States? |
| 4 | A. | Yes, they are.  In San Diego. |
| 5 | Q. | In San Diego? |
| 6 | A. | Correct. |
| 7 | Q. | Some of these questions are going to sound to you absurd.  Bear |

8  with me.

| | | |
|---|---|---|
| 9 | A. | Okay. |
| 10 | Q. | Do you have any money saved up at this point? |
| 11 | A. | Just what's in my chest account in the prison, in the jail, rather. |
| 12 | Q. | And you came right from state prison into Immigration custody, |

13  correct?

| | | |
|---|---|---|
| 14 | A. | Correct, correct. |
| 15 | Q. | Has your wife or your family given you any indication of what a kind |

16  of bond they could post if a bond were set?

| | | |
|---|---|---|
| 17 | A. | My wife has.  My mother, my family -- just my wife. |
| 18 | Q. | And, roughly, what do you think they'd be able to post? |
| 19 | A. | I would say about 10,000. |
| 20 | Q. | And you're aware of the fact that the BIA dismissed your appeal? |

21  In other words, they upheld my finding that you were subject to deportation.

| | | |
|---|---|---|
| 22 | A. | Yes, I am aware, Your Honor. |
| 23 | Q. | And I understand from your wife and from the Government that |

24  you've filed a petition for review with the 9th Circuit?

| | | |
|---|---|---|
| 25 | A. | I filed a motion to stay, pending a finding of the petition review, |

1    Your Honor.

2              Q.      Okay.  What year did you get convicted?

3              A.      1995.

4              Q.      Okay.  And so you were in state prison from the time of your

5    conviction until you got taken into custody by ICE, correct?

6              A.      Actually, it was, I came to prison May 2, 1996, and paroled from

7    state prison September 18, 2014.  And I've been in ICE custody since.

8              Q.      And I know it's -- well, that's all right, it's in the record because my

9    decision is in the record and the BIA's decision is in the record.  Do you want to return to

10   the Philippines or do you want to remain in the United States?

11             A.      I want to remain in the United States.

12             Q.      That's because your family is here?

13             A.      Correct.

14             Q.      Understood.

15   JUDGE TO MS. CASTRO

16             Government, questions?

17   MS. CASTRO TO JUDGE

18             Thank you, Your Honor.

19   MS. CASTRO TO MR. SALES

20             Q.      How old were you in '96, when you went to jail?

21             A.      I was 18 in 1995, and I was arrested in, I believe, February 28th.  I

22   came to prison at the age of 19 in 1996.

23             Q.      So the victim's name was Moreno, right?

24             A.      Correct.

25             Q.      And how old was Moreno when he died?

1   Q. Gave him your gun?

2   A. (No audible response.)

3   Q. You gave Villay your gun?

4   A. Yes, I did.

5   Q. And you gave him the ammunition?

6   A. Right.

7   Q. And you did not apply for any relief from removal, correct?

8   A. Correct.

9   Q. When you were before the Immigration Judge, you didn't apply for

10 any relief from removal, you just argued you weren't even subject to removal, correct?

11   A. Correct.  The aggravated felony and -- it would be, where the

12 termination of proceedings?

13   Q. Correct.  And you don't have any fear of return to the Philippines,

14 correct?

15   A. No.  Correct, that's correct.

16 MS. CASTRO TO JUDGE

17   I have nothing further, Your Honor.

18 JUDGE TO MR. SALES

19   Mr. Sales, anything else you wanted to tell me about the case before I

20 conclude?

21 MR. SALES TO JUDGE

22   Yes, Your Honor.  As horrible as it sounds, and I know what he was going

23 to do with my gun, he wouldn't know about my gun.  Honestly.  There's testimony that,

24 when I heard gunshots, that I said, oh shit.  But it stills hits you in the back that I own my

25 gun.  I just want you to take that in consideration.

A029-556-125       8       March 25, 2015

1   JUDGE TO MS. GELY

2           Mrs. Sales, was there anything you wanted to say?  Come on, let's get

3   you in the witness stand.

4   MS. GELY TO JUDGE

5           I'm not really prepared because, like I said, I just found this morning.

6   JUDGE TO MS. GELY

7           Tell us your full name.

8   MS. GELY TO JUDGE

9           My name is Michelle Gely (phonetic sp.).  I actually haven't changed my

10  name yet.

11  JUDGE TO MS. GELY

12          That's fine.  Do you swear any statements you make will be the truth?

13  MS. GELY TO JUDGE

14          Yes, I do.

15  JUDGE TO MS. GELY

16          Q.      All right.  You know the issues here, as I've mentioned to him,

17  danger to the community, flight risk -- anything you wanted to tell me to take into

18  consideration?

19          A.      Yeah.  I was just hoping that you do take into consideration his age

20  when the crime committed, the fact that he didn't do it, the intent wasn't there, and that's

21  our argument.  And that's been our argument with the 9th Circuit, or with you, the BIA,

22  and now the 9th Circuit regarding the harsh extension of the natural and probable

23  consequence doctrine.  Which is what he was found guilty for.  So I'm a strong believer,

24  and I really hope that the 9th Circuit will look at the case because it is a state conviction

25  versus federal conviction argument.  So I feel like we have a pretty strong chance.  As

A029-556-125                                    9                              March 25, 2015

1   far as my husband goes, I've known him since I was 11 years old, and we grew up

2   together, and he's always, he was never really violent, I think he always just seeked

3   (phonetic sp.) attention. And he kind of went with the wrong crowd. And that's really

4   what happened. Ever since he's been incarcerated, he's never been into any violent

5   trouble, he's done everything he can to lower his classification, rehabilitation efforts, and

6   anger management, anything that he can possibly do to get out. Because, like I said,

7   he did have a life sentence. And he didn't let him discourage him, he's always remained

8   positive. And I feel like he deserves at least a chance on bond because he has been

9   incarcerated for 20 years. And if in the end, eventually, if he is deported to the

10   Philippines, I'm just hoping maybe during this time, if he is out on bond, that maybe he

11   can just get acclimated to being in the free world before he gets shipped off to a country

12   he has nothing, he knows nothing about, because he's been here since he was 5 years

13   old. His father was in the U.S. Navy, came here as a military dependent in 1982.

14   Basically, they're saying the only reason why he's not a derived citizen is because his

15   mother didn't file the proper paperwork. But if he was born, say in 1982, only one

16   parent needed to be naturalized, so it's like a technicality here. So, I mean, I'm just

17   hoping at lease, can he come home while he's fighting in the 9th Circuit, get him

18   acclimated to the free world. I mean, I'm a U.S. citizen, law abiding citizen. I have a

19   stable job for 10 years. I'm a single mother. I'm financially stable. I'm willing to pay

20   anything just to get him home and acclimated to that free world just in case he is

21   deported. It's been 20 years. He was 18, in high school. And he didn't, he was

22   convicted as an aider and abettor. And I knew him then. And he would have never

23   done anything like that, I know it.

24   JUDGE TO MS. CASTRO

25           Government, any questions for this witness?

1    MS. CASTRO TO JUDGE

2          None, thank you.

3    JUDGE TO MR. SALES

4          Okay.  Mr. Sales, thank you very much.  Here's what I'm going to do.  I'm

5    not going to make a decision today because I haven't had a chance to read all the

6    documents your wife gave me.  So I'm just going to hold onto the decision for now.

7    JUDGE TO OFFICER

8          Officers, there's no new court date for Mr. Sales.

9    JUDGE TO MS. GELY

10          He had another witness?

11    JUDGE TO MR. GUERRERO

12          Yes, sir, come on.

13    JUDGE TO MS. CASTRO

14          Hold on, there's one other witness where he --

15    JUDGE TO MR. GUERRERO

16          Please, sir, tell us your name?

17    MR. GUERRERO TO JUDGE

18          Tido Jime Guerrero (phonetic sp.).

19    JUDGE TO MR. GUERRERO

20          And do you swear any statements you make will be the truth?

21    MR. GUERRERO TO JUDGE

22          Yes.

23    JUDGE TO MR. GUERRERO

24          Q.    What's your relationship to Mr. Sales?

25          A.    Mr. Sales was actually, I was cell mates with him in prison for two

A029-556-125                    11                    March 25, 2015

1    and a half years.

2           Q.      Okay.

3           A.      I consider him one of my best friends.  I actually, when I met him in

4    1999 in Solano State Prison, I myself had a life term sentence as well.  It got overturned

5    subsequently four years later, and I've been out for six years now.  And I'm here to let

6    you know that one, over the course of ten years of being incarcerated with this

7    individual, not only have I seen a massive amount of changes in him, he got me on

8    track.  And in the six years I've been home, I bought a house, I have a new car.  I'm a

9    senior director of retail sales and operations for Goodwill Industries in the Greater East

10   Bay.  I supervise over 250 people.  And I'm letting this Court know, if you grant him bail,

11   I will have him a job and residence, if you don't want him staying with his wife.  John --

12   and, sorry, I'm getting a little emotional.  John pushed me to rehabilitate myself.  He

13   gave me two great numbers that I'll never forget, and I tell this story all the time.  He

14   said in five years you feel like you just got here again.  And he was right.  And he told

15   me in seven years you're going to make a conscious decision to either run with

16   everyone else in prison, or dissociate yourself and get ready to go home.  I lived by

17   those two numbers.  And I dedicate my success to that man that's sitting on the other

18   end of that screen.  If you give him the opportunity to bail, I will put my freedom up to

19   make sure he makes anything you need him to do in the future.  I've gotten to know his

20   wife, his step-son.  That man is more American than I am, and I'm a first-generation

21   American.  And it would be a tragedy to have myself, now who is a tax-payer for the last

22   six years, pay for him to stay in prison just to get deported.  If we were going to do that,

23   we should have did it right away.  He could be a valuable asset to this society.  Because

24   if I can get out with less under my belt than he has right now, and do the things I've

25   done, I just wish someone would give him that same opportunity.

A029-556-125                            12                        March 25, 2015

1    JUDGE TO MR. GUERRERO

2         All right.  Thank you, sir.

3    JUDGE TO MS. CASTRO

4         Government, any questions for this witness?

5    MS. CASTRO TO JUDGE

6         None, thank you.

7    JUDGE TO MR. GUERRERO

8         All right.  Thank you very much.

9    JUDGE TO MR. SALES

10        All right.  So, Mr. Sales, let me hold onto this because I want to read

11   everything that your wife gave me.  And my expectation is no later than Friday, or I

12   should say no later than Monday that I'll get a decision out for you.  Okay.

13   JUDGE TO MS. CASTRO

14        All right.  Anything else in this for the Government?

15   MS. CASTRO TO JUDGE

16        Nothing, thank you.

17   JUDGE FOR THE RECORD

18        Okay.  Hearing concluded.

19                          <u>HEARING CLOSED</u>

20

21

22

23

24

25

## CERTIFICATE PAGE

I hereby certify that the attached proceeding before JUDGE ANTHONY S. MURRY, in the matter of:

CORNELIUS DELA CRUZ SALES

A029-556-125

SAN FRANCISCO, CALIFORNIA

was held as herein appears, and that this is the original transcript thereof for the file of the Executive Office for Immigration Review.

MICHAEL LAUDENBACH (Transcriber)

DEPOSITION SERVICES, Inc.-2

May 7, 2015

(Completion Date)

# Exhibit II.

# Bond Hearing Decision

IMMIGRATION COURT
630 Sansome Street, 4th Floor
San Francisco, CA   94111

In the Matter of:                          Case No: A _029 556 125_

_Cornelius de la Cruz Sales_
                 Respondent

                                    IN BOND PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE

Request having been made for a change in custody status of the respondent pursuant
to 8 C.F.R. Part 236 and having considered the representations of the Immigration
and Naturalization Service and the respondent, it is
HEREBY ORDERED that:

[ ✓ ]  The request for a change in custody status of the respondent be denied.

[ ]  The request for a change in custody status of the respondent be granted
     and respondent be:

        [ ]  Released from custody upon posting a bond of $_____
             (not less than $1500).

        [ ]  Released on own recognizance.

[ ]  No jurisdiction pursuant to 236 of the Act.

[ ✓ ]  Other: _Respondent is ordered detained_
       _____

Date: 3/27/15                        _AМ__

                                     Immigration Judge
                                     Anthony S. Murry

Appeal: Reserved/Waived  (A/(W)/B)  Due by: _4/27/15_

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  [ ✓ ] MAIL      [ ] PERSONAL SERVICE
TO:  [ ✓ ] ALIEN [ ] ALIEN c/o Custodial Officer [ ] ALIEN'S ATTY/REP [ ✓ ] DHS
DATE: ___3/27/15___       BY:  COURT STAFF  _NMC_
Attachments: [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List [ ] Other

# Exhibit III.

# Motion to reconsider bond

*1st
Motion to
Reconsider*

CORNELIO SALES  JR.
5060 VALLEY CREST DRIVE #54
CONCORD. CA. 94521
209-981-7435
**PRO SE**

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### OFFICE OF THE IMMIGRATION JUDGE
### 630 SANSOME STREET, SUITE 475
### SAN FRANCISCO, CA. 94111

| | |
|---|---|
| In the Matter of: | ) File No. : A-029-556-125 |
| | ) |
| CORNELIO SALES JR. | ) **MOTION TO RECONSIDER BOND** |
| | ) |
| **RESPONDENT** | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## MOTION TO RECONSIDER BOND UNDER *RODRIGUEZ v. ROBBINS*

Respondent respectfully requests a motion to reconsider his custody redetermination hearing under *Rodriguez v. Robbins*, 2:07-cv-03239 (C.D. Cal. Sept. 13, 2012), Immigration Judge Murry denied bail on March 27, 2015 with a written decision sent to the Respondent. Upon receiving this written decision, there was no reason for denial other than "Respondent ordered detained." This decision to deny bond did not at all stipulate any factors of Respondent (1) being or even a potential of being a flight risk. (2) being or even a potential of being a danger. (3) or both. The IJ erred when he did not provide a reason for denial and the Respondent requests a new bond hearing based on an *individualized* determination of his dangerousness and flight risk, with specific reasoning as to why he should or should not be granted bond while fighting his removal proceedings.

Motion to Reconsider Custody Hearing                                    A-029-556-125

Respondent was not given a notice in advance of his bond hearing on March 25, 2015 and was not able to secure all of his evidence in support of bond. The following new information submitted in this motion to reconsider now categorizes Respondent under a *Casas* hearing and thus held "that the government may not detain a legal permanent resident such as Casas for a prolonged period without providing him a neutral forum in which to contest the necessity of his continued detention." *Id.* at 949. Furthermore, "with the regard to the appropriate burden of proof, given the substantial liberty interest at stake... the government must prove by clear and convincing evidence that an alien is a flight risk or danger to the community to justify denial of bond at a *Casas* hearing." Singh, 638 F 3.d at 1203.

Furthermore, in *Rodriguez v. Robbins* at 19, the court states, "As we held in *Casas,* the prolonged detention of an alien without an *individualized* determination of his dangerousness or flight risk would be constitutionally doubtful." 535 F. 3d at 95 (internal quotation marks omitted).

## A. RESPONDENT SHOWS A STRONG SHOWING OF SUCCESS IN THE NINTH CIRCUIT

Respondent has secured his case for review in the Ninth Circuit under Case No. 15-70885, and has paid the fee in the amount of five hundred dollars upon filing a Petition of Review.

The Ninth Circuit Model Criminal Jury Instruction 5.1 (requiring, for aiding and abetting liability, that the government prove that "the defendant aided, counseled, commanded, induced or procured [the principal] with respect to at least one element of [the crime charged]"and that "the defendant acted with the intent to facilitate [the crime charged]"). *Roman- Suaste V. Holder* Case No 12-7395 (9th Cir.2014)

Motion to Reconsider Custody Hearing

A-029-556-125

In *Roman- Suaste* this court compared this instruction to California Jury Instruction 3.01 (A person aids and abets the commission of a crime when he or she, (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime.)

Respondent has raised legal arguments to the IJ and the BIA that he was not convicted under this California Jury Instruction, but rather California Jury Instruction 3.02. His actual Jury Instructions (under 3.02) along with a special instruction used in his case has been submitted in support of his arguments. This case can set precedent because Respondent was convicted by "jury trial", it can be proven in record that the Jury Instruction used to convict was in fact 3.02. All other cases citing that California and federal aiding and abetting is the same are all cases where the defendant has plead guilty to the crime charged.

Since Removal proceedings are a function of federal law, we should rely to a significant degree on the federal definition of an offense, where available. *See Matter of M-W*, 25 I&N Dec. 748 (BIA 2012).

Respondent has a strong chance of success in the Ninth Circuit Court when determining he was not convicted under *federal aiding and abetting guidelines* in respect to knowledge and intent of the crime charged, and that his conviction should not be charged as an aggravated felony and that removal proceedings should be terminated.

## B. THE GOVERNMENT DID NOT SHOW BY CLEAR AND CONVINCING EVIDENCE THAT CONTINUED DETENTION IS JUSTIFIED BASED ON DANGER TO COMMUNITY AND FLIGHT RISK

On March 25, 2015, a bond determination hearing was held for Respondent where the Government "must show by clear and convincing evidence that continued detention is justified

Motion to Reconsider Custody Hearing

A-029-556-125

- 3 -

based on his or her danger to the community or risk of flight". *Rodriguez v. Robbins,* Id at 5. Respondent argues that the Government Attorney did not provide argument opposing his release on bail. In Fact, Respondent had two witnesses testify of behalf of support of release, his wife, Michelle Healey and his good friend Tito Guerrero. The Government Attorney had opportunity to ask questions to support an opposition of release, but she did not. The Government Attorney had no opposition when the Immigration Judge set a reserved decision upon a review of the supporting documents submitted in support of his rehabilitation efforts and psychological evaluations deeming him a low risk of future violence since 2007.

## C. RESPONDENT WOULD BE RELEASED ON REASONABLE CONDITIONS OF SUPERVISION

In *Rodriguez v. Robbins,* Respondent is entitled to a bond hearing before this court where he must be release[d] on reasonable conditions of supervision, including electronic monitoring if necessary, unless the government shows by clear and convincing evidence that continued detention is justified based on his or her danger to the community or risk of flight. Id at 5.

Respondent urges this court to consider the fact that upon release on bail, pending a Ninth Circuit ruling, he will be subject to parole conditions set forth by the State of California. He will report immediately to his parole officer in Contra Costa County and it can be guaranteed that Respondent will follow all parole conditions and understands the circumstances of any violations.

It can be asserted that Respondent will obey the law; he will be subject to parole for at least the next five years and the Ninth Circuit ruling is not expected to take that long, guaranteeing he is not a flight risk, nor a danger to society. Respondent only wishes to reunite with his United States Citizen wife, stepson and father, as well as the rest of his family, all lawful

Motion to Reconsider Custody Hearing

A-029-556-125

permanent residents. He wishes to acclimate to the free world and adjust to a new lifestyle in the event that he is ordered removed banished to a country he doesn't know and hasn't been to since he was a child. Respondent has no desire to cause any harm to the public or put anyone at risk; he would not be fighting so hard to stay in this Country to be put in a position that would force him to further confinement in State prison.

## D. MANDATORY DETENTION IS NO LONGER APPLICABLE TO RESPONDENT UNDER *CASAS-CASTRILLON*

Respondent's case has reached the Ninth Circuit Court of Appeals, and is currently pending a petition of review. In *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942 (9th Cir. Cal. 2008), it was made clear that once an alien files a Ninth Circuit petition for review challenging a removal order, the governing detention authority enduringly shifts to section 236(a) of the Act and cannot return to section 236(c) if the petition for review is granted and the case is remanded to the Board. Id.at 947-48; Under INA § 236(a) the Immigration Judge may release on bond or grant conditional parole. At this solicited hearing, Respondent is "entitled to release on bond unless *the government* establishes a flight risk or will be a danger to the community." *Id.* at 951 (citations omitted)(emphasis added).

The *Casas-Castrillon* panel held that a *lawful permanent resident* alien who (1) has filed a circuit petition for review challenging a final order of removal; (2) has obtained a stay of removal in conjunction with that petition; and (3) has been subjected to "prolonged detention,"—i.e., confinement in excess of the presumptive 6-month period during which the detention of an alien is reasonably necessary—is entitled to an individualized custody redetermination hearing before an Immigration Judge pursuant to section 236(a) of the Act, even if the alien was previously detained under section 236(c) of the Act during the removal proceeding. *Id.* at 947-48

Motion to Reconsider Custody Hearing

A-029-556-125

- 5

In *Singh v. Holder*, 638 F.3d 1196, 1200 (9th Cir. 2011), the Ninth Circuit took the opportunity to address the various "procedures that must be followed in [Casas] hearings to comport with due process." In particular, *Singh* held in regard to Casas bond proceedings that (1) "the clear and convincing evidence standard of proof applies;" (2) a contemporaneous record of the hearing must be created; and (3) Federal district courts have habeas corpus jurisdiction under 28 U.S.C. § 2241 to review these final bond determinations for "constitutional claims and legal error." Id. at 1205, 1208. Perhaps as important, *Singh* made it clear that when assessing the prongs of "danger" and "flight risk," Immigration Judges must faithfully apply the *Matter of Guerra* factors while specifically considering the "recency and severity" of an alien's criminal history. Id. at 1206. As is the case with a bond hearing governed by section 236(a) of the Act, *Singh* held that in a Casas hearing Immigration Judges may rely "upon any information that is available . . . or that is presented . . . by the alien or the [DHS]." 8 C.F.R. § 1003.19(d).

Respondent was not considered based on these factors, and was not asked any questions that would assess his current danger or flight risk justifying a bond denial at his hearing. In fact the Government never opposed a release on bond. Under *Guerra, 24 I. & N. Dec. 37 (BIA 2006)*, the government has to overcome his right to be released on bond and should be asked to produce evidence: that he lacks a fixed address in the United States, his residence in the United States is short, he lacks family ties in the United States, he lacks an employment history, he has failed to meet obligations to a court, his criminal record is extensive, recent, and serious, he has a history of immigration violations, and has sought to flee prosecution or attempted to escape the authorities. When addressing whether an alien is a danger to persons or property, there must be a focus on "the recency and severity of the offenses" while keeping in mind *Singh's* instruction that "not all criminal convictions conclusively establish that an alien presents a danger." *Singh*

Motion to Reconsider Custody Hearing

A-029-556-125

- 6

, 638 F.3d at 1206. Similarly, the fact that an alien is subject to an administratively final order, while obviously important, is not sufficient by itself to support a finding that an alien is a flight risk who warrants detention without bond. See id. at 1205 ("Although [the final administrative order] is a relevant factor in the calculus, it alone does not constitute clear and convincing evidence that *Singh* presented a flight risk justifying denial of bond.").

### E. FURTHER SUPPORTING LETTERS FROM HIS FAMILY IN SOUTHERN CALIFORNIA

In further support of release on bond, Respondent wishes to attach supporting letters and documents from his family in Southern California. (*See* Exhibit D). Respondent's Parents are senior citizens wishing to reunite with their son, and if given bail, plan to come to Concord California immediately.

Respondent's parents have many medical conditions that prevent them from moving to the Philippines if their son is deported. Respondent's father served twenty –three years in the United States Navy and relies on his medical benefits received from serving this country.

### CONCLUSION

With the aforementioned above, Respondent respectfully requests a reconsideration of bond where an individualized determination of dangerousness and or flight risks determines his entitlement to a release on bond with a reasonable bail.

Executed on: April 3, 2015

Respectfully Submitted,

Cornelio Sales
Respondent
**Pro Se**

Motion to Reconsider Custody Hearing

A-029-556-125

- 7

# Exhibit IV.

# Memorandum decision denying motion to reconsider bond

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA

| | | |
|---|---|---|
| Matter of | ) | Date: April 15, 2015 |
| | ) | |
| **Cornelio Sales,** | ) | File Number:  **A 029 556 125** |
| | ) | |
| Respondent | ) | In Bond Proceedings |
| | ) | |
| _____ | ) | **MEMORANDUM** |

  The respondent has filed a motion for reconsideration of this court's March 27, 2015 denial of his request for release on bond pursuant to *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013).   The respondent is under the impression that because this court issued a summary order, the court did not consider all appropriate factors, and did not individually evaluate his request for bond.   Respondent's impression is incorrect.   In order to provide respondents with prompt rulings on a bond requests, the standard procedure in the immigration courts is to issue a summary order, and to issue a bond memorandum setting forth the court's reasoning if and when the summary decision is appealed to the BIA.

  While the court understands that respondent thinks he is a good bail risk, the court disagrees.   And neither the respondent's disagreement with the court's ruling, nor the arguments and documents submitted by the respondent persuade this court that respondent is anything other than a very poor bail risk.

  The respondent's motion for reconsideration is denied.

**Anthony S. Murry**
**Immigration Judge**

# Exhibit V.

# BIA Appeal

CORNELIO SALES  
5060 VALLEY CREST DRIVE #54  
CONCORD, CA. 94521  
209-981-7435  
**PRO SE**

**DETAINED**

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### BOARD OF IMMIGRATION APPEALS

In the Matter of:

CORNELIO SALES

In Bond Proceedings

File No. : A-029-556-125

RESPONDENTS BRIEF ON APPEAL FOR BOND ELIGIBILITY

TABLE OF CONTENTS

Page

I.     SUMMARY OF ISSUES ................................................................. 1

II.    STATEMENT OF FACTS ................................................................ 1

III.   THE RESPONDENT DID NOT FILE A MOTION FOR BOND AS INDICTED
       IN THE IMMIGRATION JUDGE'S BOND MEMORANDUM ...................................... 3

IV.    THE IMMIGRATION JUDGE FAILED TO CONDUCT A BOND HEARING
       AS A NEUTRAL DECISION MAKER WHERE RESPONDENT IS FACING
       PROLONGED DETENTION ............................................................. 3

       A.    BURDEN OF PROOF ............................................................ 4

       B.    PROCEDURES THAT MUST BE FOLLOWED TO COMPORT
             WITH DUE PROCESS .......................................................... 6

       C.    THE IMMIGRATION JUDGE'S BOND DENIAL IS NOT
             SUPPORTED BY CLEAR AND CONVINCING EVIDENCE ............................... 8

       D.    THE IMMIGRATION JUDGE'S FAILED TO CONSIDER THE
             EVIDENCE SUPPORTING AN ASSURANCE THAT
             RESPONDENT WILL APPEAR FOR FUTURE PROCEEDINGS ......................... 9

       E.    STRONG FAMILY TIES IN THE UNITED STATES .......................... 10

       F.    BEHAVIOR WHILE IN CUSTODY ...................................... 11

V.     THE IMMIGRATION JUDGE RELIES ON A SUPREME COURT DECISION
       THAT RESPONDENT IS UNLIKELY TO PREVAIL ON HIS RELIEF FROM
       REMOVAL ...................................................................... 12

       A.    CALIFORNIA'S POST CONVICTION RELIEF IN MURDER
             CASES INVOLVING THE NATURAL AND PROBABLE
             CONSEQUENCE DOCTRINE .................................................. 13

VI.    CONCLUSION ............................................................... 15

## I.     SUMMARY OF ISSUES

1. The respondent did not file a motion pursuant to *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013) as indicated in the Immigration Judge's Bond Memorandum dated April 28, 2015.
2. Respondent was not notified in advance of such hearing as required under *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013)
3. The Immigration Judge failed to correctly conduct a bond hearing pursuant to *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013) as a *neutral decision maker*, where the burden of proof is on the DHS to establish clear and convincing evidence that prolonged detention is justified.
4. The Immigration Judge's personal opinion that Respondent will not comply with an order of removal if he is ultimately ordered deported is not supported by clear and convincing evidence.
5. The Immigration Judge failed to consider the evidence that respondent is subject to parole conditions in the state of California which can assure his appearance if removal is ordered.
6. The respondent has a petition of review pending in the Ninth Circuit and is entitled to a *Casas* hearing under *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942 (9th Cir. Cal. 2008). The Immigration Judge erred in not holding the government to a heightened standard of proof to justify a denial of bond. Procedures that must be followed in *Casas* hearings to comport with due process has been addressed in *Singh v. Holder*, 638 F.3d 1196, 1200 (9th Cir. 2011)
7. The Immigration Judge relies heavily on the fact that the respondent has no relief from removal based on the Supreme Court holding on aiding and abetting liability under *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007). Respondent has always argued that *Duenas-Alvarez* left this decision open by introducing the "realistic probability" standard. Respondent's case is a perfect example in showing that a state statute would apply conduct that falls outside the generic definition of a crime. *Id.* at 193.
8. The Immigration Judge failed to recognize the change in California law that respondent has always argued regarding the natural and probable consequence doctrine relating to culpability in murder convictions under *People v. Chiu* 59 Cal. 4th 155) (2014). This fact alone validates serious questions relating to state versus federal laws warranting a case with the Ninth Circuit and a possible relief of removal.
9. Respondent has very strong ties to the United States and should be recognized as a positive factor when considering bond.
10. Respondent's behavior while in custody supports a release on bond.

## II.     STATEMENT OF FACTS

Respondent, Cornelio Sales Jr. is a thirty-eight year old legal permanent resident; he was born in the Philippines but has resided legally in the United States since the age of five.

Respondent entered the United States as a military dependent, and adjusted to legal permanent resident status in 1989.

In 1995, respondent, still in high school was convicted of second degree murder in the state of California in violation of Cal. Penal Code Section 187, as an aider and abettor under the natural and probable consequence doctrine and was sent to prison with a fifteen to life sentence. After twenty years into his sentence the State Governor approved respondent's parole grant and was given a release date on September 18, 2014, respondent was immediately transferred to DHS custody where he remains today.

Respondent has been detained for more than nine months and his case is currently pending a petition of review in the Ninth Circuit Court and removal is not likely in the near future. On March 25, 2015, respondent received a bond hearing pursuant to *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013). Mandatory detention no longer applies to the respondent and although the government bears the burden of proving danger or flight, he has provided many years' worth of certificates in education, rehabilitation and self-help programs that has earned him a second chance and a release from prison. He has psychological evaluations dating back to 2007 deeming him a low risk of future violence. He has provided support letters from his United States Citizen wife, his father, who served twenty- three years in the United States Navy and whose health is diminishing. As well as his siblings and mother, all legal permanent residents. At respondent's bond hearing, the government attorney never opposed a release on bond. The Immigration Judge set a reserved decision to go over the documents provided by respondent; he denied bail two days later on March 27, 2015.

This appeal presents legal and factual citations of law that entitles him to bond unless *the government can prove by clear and convincing evidence that he is a flight risk or a danger to the*

*community.* Respondent filed a motion to reconsider bond with the immigration court on April 10, 2015, providing further support and identifying the fact he would be released on parole supervision by the State of California, *Rodriguez* has held that Judges should be considering restrictions short of incarceration, including house arrest with electronic monitoring (*id.* at 1131) or in respondents case, he would be subject to parole. The Immigration Judge denied this request.

Respondent argues the Immigration Judge did not base his denial on a heightened clear and convincing evidence standard, and requests this court to grant a reasonable bond and allow him to reunite with his family while he is awaiting the decision from the Ninth Circuit Court of Appeals.

### III.   THE RESPONDENT DID NOT FILE A MOTION FOR BOND AS INDICTED IN THE IMMIGRATION JUDGE'S BOND MEMORANDUM

Respondent would like to clarify that he did not file a motion for bond pursuant to *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013) which prompted a March 25, 2015 hearing. In fact, respondent was unexpectedly called for court on this morning at approximately 0245 hours. Respondent was unaware of such proceedings until he was at the Sacramento California ICE field office. Per *Rodriguez*, detainees are to be informed in advance of their bond hearing by way of correspondence in plain language, this is consistent with due process concerns.

Respondent called his wife collect from his holding cell who then found out by calling the court house that he had a bond hearing that afternoon. Fortunately, she was able to gather up supporting documents and drive to San Francisco in support of her husband's release.

### IV.   THE IMMIGRATION JUDGE FAILED TO CONDUCT A BOND HEARING AS A NEUTRAL DECISION MAKER WHERE RESPONDENT IS FACING PROLONGED DETENTION

"Where an alien falls within this statutory scheme can affect whether his detention is mandatory or discretionary, as well as the kind of review process available to him if he wishes to

contest the necessity of his detention." *Prieto-Romero v. Clark*, 534 F.3d 1053, 1057 (9th Cir. 2008). There are two main differences between an ordinary bond hearing and a bond hearing for a detainee facing prolonged detention. First, for a prolonged detention bond hearing, the *government*, and not the respondent, must bear the burden of proof. Second, the government must likely prove by clear and convincing evidence that the detainee is a flight risk or danger to the community to justify continued detention. See *Diouf*, 634 F.3d at 1086. Respondent has been detained for over nine months and prolonged detention requires a *heightened* showing of dangerousness and flight risk and the justification for detention must be stronger than in typical bond cases. (Holding that "[w]hen the period of detention becomes prolonged, the private interest that will be affected by the official action is more substantial; greater procedural safeguards are therefore required" (internal quotation marks and citation omitted)). *Id.* at 1091

The Immigration Judge failed to correctly conduct a bond hearing pursuant to *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013) as a *neutral decision maker* because respondent's detention has become prolonged... *Rodriguez* held that the government "must show by clear and convincing evidence that continued detention is justified based on his or her danger to the community or risk of flight". *Id* at 5.

A. BURDEN OF PROOF

In Zadvydas, the Supreme Court made clear that immigration detention implicates a fundamental liberty interest–the right to be free from physical restraint–and is subject to the same due process constraints as other forms of civil detention. *Zadvydas*, 533 U.S. at 690-91. Thus, like other forms of civil detention, immigration detention must bear a "reasonable relation" to its purpose. Especially where it is prolonged, due process requires a sufficiently strong justification that "outweighs the individual's constitutionally protected interest in avoiding physical restraint."*Id.*at 690 (quotations and citations omitted).

The Immigration Judge states in his bond memorandum:

> ... The Government bears the burden in this proceeding to show by clear and convincing evidence that the respondent is a danger to the community, a risk of nonappearance, or both. However, "an alien in removal proceedings has no constitutional right to release on bond. *See Carlson v. Landon* , 342 U.S. 524, 534 (1952). Rather section 236(a) of the Act merely gives the Attorney General the authority to grant bond if he concludes, in the exercise of discretion, that the alien's release on bond is warranted." *Matter of Guerra,* 24 I&N Dec. 37 (BIA 2006).

> ... The court does not need to reach the question of whether the respondent currently presents a danger to others or not, because respondent is an acute risk of nonappearance and an exceedingly "poor bail risk." *Matter of Guerra, supra at 40.* In addition to his lack of assets and his lack of property ties, as noted above respondent has been ordered removed by this court and by the BIA. The issue to be decided at present, then, is not whether respondent will appear for future removal hearings, because he has no removal hearings scheduled. The issue is whether he will report for removal if so ordered.

The Immigration Judge gives the impression that due to the facts of respondent's case, he does not have any constitutional right to due process or the procedures set forth in *Rodriguez*. In fact, the case laws cited by the Immigration Judge all appear to be cases before *Rodriguez, Singh and Casas,* these are all cases that are consistent with due process and should be followed when detention has become prolonged. Just because respondent lacks assets or property of his own, does not make him a flight risk, and just because he has been ordered removed by the Immigration Judge in which a one-member panel from the BIA affirmed, does not mean he will not succeed in the Ninth Circuit Court of Appeals. It is possible that if respondent was given a different Judge in his removal proceedings, a different outcome may have concluded. That is the reason the Ninth Circuit is in place for review, the Ninth Circuit retains jurisdiction over "constitutional claims or questions of law," 8 U.S.C.§ 1252(d), which includes the question

whether a state crime of conviction is an aggravated felony.

The fact that respondent has a petition for review in the Ninth Circuit entitles him to a *Casas* hearing, *Rodriguez,* held "that the government may not detain a legal permanent resident such as *Casas* for a prolonged period without providing him a neutral forum in which to contest the necessity of his continued detention." *Id.* at 949. Furthermore, "with the regard to the appropriate burden of proof, given the substantial liberty interest at stake… the government must prove by clear and convincing evidence that an alien is a flight risk or danger to the community to justify denial of bond at a *Casas* hearing." *Singh,* 638 F 3.d at 1203. Again, in *Rodriguez at* 19, the court states, "As we held in *Casas,* the prolonged detention of an alien without an *individualized* determination of his dangerousness or flight risk would be constitutionally doubtful." 535 F. 3d *Id.* at 951 (internal quotation marks omitted).

The proceedings at issue here are civil, not criminal, there is no sufficiently strong special justification for indefinite civil detention, there is no strong evidence showing that respondent is a poor bail risk or likely to abscond. The Government has two regulatory goals: "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community." But by definition the first justification—preventing flight—is weak or nonexistent where removal seems a remote possibility at best. As the Court said in *Jackson* v. *Indiana,* 406 U. S. 715 (1972), where detention's goal is no longer practically attainable, detention no longer "bears a reasonable relation to the purpose for which the individual was committed." *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001).

## B.  PROCEDURES THAT MUST BE FOLLOWED TO COMPORT WITH DUE PROCESS

In *Singh v. Holder,* 638 F.3d 1196, 1200 (9th Cir. 2011), the Ninth Circuit took the opportunity to address the various "procedures that must be followed in *Casas* hearings to

comport with due process." In particular, *Singh* held in regard to *Casas* bond proceedings that "the clear and convincing evidence standard of proof applies." *Id.* at 1205, 1208. Perhaps as important, *Singh* made it clear that when assessing the prongs of "danger" and "flight risk," Immigration Judges must faithfully apply the *Matter of Guerra* factors while specifically considering the "recency and severity" of an alien's criminal history. *Id.* at 1206.

Singh clarifies that the Supreme Court, "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty." *Addington,* 441 U.S. at 425, 427 (emphasis added) (concluding that the individual's interests were "of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere pre-ponderance of the evidence").

Finally, *Singh* recognized the common fact between all detainees afforded a *Casas* hearing is that they have already been ordered removed by a final administrative order, diminishing an incentive to appear for further removal proceedings. It appears the Immigration Judge did not base his denial on danger, but rather because he has already been ordered removed by him and the BIA, and doesn't think respondent is likely to appear for removal if and when he is ordered removed. *Singh* held that the fact that an alien is subject to an administratively final order, while obviously important, is not sufficient by itself to support a finding that an alien is a flight risk who warrants detention without bond. (*Id.* at 1205). Respondent is still contesting his removal and argues that as a legal permanent resident who entered the United States legally, he has a greater entitlement to due process than those who have already lost their case.

### C. THE IMMIGRATION JUDGES' BOND DENIAL IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE

Respondent's bond hearing lacked a personal interview, and a genuine opportunity to contest the underlying concern the Immigration Judge appears to have in his bond memorandum, which is, that he will not appear for removal is so ordered. Respondent has provided years' worth of evidence supporting a release on bond showing he is neither a danger nor a flight risk; it is the government attorney who had the burden at this hearing to prove otherwise. That was not the case here; The Immigration Judge based his decision to deny bail not as a neutral decision maker, but rather from identifying statistics and case laws of an alien's likeliness to abscond from a final order of removal.

There was never an individualized assessment at respondent's hearing, and all evidence he provided in support of a release, according to the Immigration Judge gives respondent the incentive to *avoid* reporting for removal, if ordered removed. This is not a fair assessment by a neutral decision maker when the Immigration Judge formulates hypothetical scenarios to base his concerns of flight risk without evidence on record.

The Immigration Judge points out the fact that the respondent has been continuously in custody since 1995 which is the reason why he has not failed to appear for any criminal or immigration proceedings; that does not mean had he not been in custody he would have not appeared. The Immigration Judge cannot assume that respondent will be a significant flight risk or poor bail risk when there is no evidence of such within record. The fact that the respondent has paroled from a life sentence tells a lot about his likeliness to appear for future hearings. For the past twenty years, he has been respectful, cooperative, has accepted his conviction, and has done everything he has been told to do. Upon release he would be subject to conditions that

would not allow him to abscond, that would assure his presence if and when he is ordered removed.

### D. THE IMMIGRATION JUDGE FAILED TO CONSIDER THE EVIDENCE SUPPORTING AN ASSURANCE THAT RESPONDENT WILL APPEAR FOR FUTURE PROCEEDINGS

*Rodriguez* held that the respondent is entitled to a bond hearing before this court where he must be release[d] on *reasonable conditions of supervision,* including electronic monitoring if necessary, unless the government shows by clear and convincing evidence that continued detention is justified based on his or her danger to the community or risk of flight. *Id.* at 5.

Respondent urges this court to consider the fact that upon a release on bond, he will be subject to parole conditions set forth by the State of California. He will report immediately to his parole officer in Contra Costa County and must continue to report to his parole officer at any given time and surrender to search and urinalysis testing at any given time. It can be guaranteed that respondent will follow all parole conditions and understands the circumstances that any violation of parole could result in being returned to custody with the California Department Of Corrections and will be subject to having his life sentence reinstated. With that said, the incentive for the respondent to appear if he is ordered removed is highly logical, he would much rather choose to report for removal and be free in a country he does not know, than go back to prison for violating his parole conditions. He still has a right to contest his removal order and that should not be a punishment subjected to civil detention if he is not a danger or threat to the community.

When the government seeks to curtail individual liberty through a civil proceeding, "the individual's interest . . . is of such weight and gravity" that the government normally must establish the grounds for detention by clear and convincing evidence. *Addington,* 441 U.S. at 427; see *Fouchav. Louisiana,* 504 U.S. 71, 80 (1992). Under that principle, even if reduced

protections are permissible for certain brief immigration detentions, see *Demore,* 538 U.S. at 531, prolonged immigration detention raises serious constitutional concerns unless a noncitizen is afforded the opportunity for an individual hearing at which the government must prove the grounds for detention by clear and convincing evidence.

Although respondent was provided an individual hearing, the Government provided no clear and convincing evidence justifying further detention. The respondent however, who is detained and limited to resources, has provided years' worth of evidence supporting a release, including parole documents securing conditional supervision that can be used to justify a release on bond. Respondent argues that the documents' he has provided is a heightened standard of proof supporting a release and it is the government who should be held accountable for proving otherwise.

### E.   STRONG FAMILY TIES IN THE UNITED STATES

Respondent argues the Immigration Judge didn't put any weight on his wife's testimony and the fact that he is a legal permanent resident whose father served in the United States Navy and is a naturalized citizen since 1982. Respondent's mother never naturalized and remains a legal permanent resident today. According to law, both parents need to be naturalized in order for their children to be derived citizens. However if you were born after 1982 only one parent is required to be naturalized.  Based on this technicality, respondent did not derive citizenship, but say if he was born 6 years later he would have qualified as a citizen. Respondent only wishes to point out that this is the only country he knows, his family is here and although willing to travel back to the Philippines to be with him in the future, medical support provided by his father's military benefits keeps them here to ensure adequate medical care. Respondent requests this court to take an individualized assessment of who he is and not base any denial or judgement on the California conviction alone. It can be asserted that respondent will obey the law; he will be

subject to parole for at least the next five years and the Ninth Circuit ruling is not expected to take that long, guaranteeing he is not a flight risk, nor a danger to society. Respondent only wishes to reunite with his United States Citizen wife, stepson, and the rest of his family.  After twenty years of incarceration, more than half his life, he only wishes to acclimate to the free world and adjust to a new lifestyle with his family's support. Respondent urges this court to show some compassion and understanding that he has been institutionalized and will need some time and family support to adjust to the free world in the event that if he is ordered removed. Respondent only wishes to be allowed some time to have a holiday season outside of confinement after twenty years.

Respondent has a fixed address with his wife and step son in Concord California in a two bedroom condominium. She has a successful career as an engineer in the wireless industry, born and raised in California whose father and grandfather both served in the United States Navy. She would never allow anything to jeopardize her career or the safety of her son and can guarantee a place of residence for respondent where he will continue to report to his parole officer as required by the State of California. Respondent has a long history in the United States since coming here e legally when he was five years old as a military dependent, and he continues to have very strong family ties, his parents, siblings, nieces and nephews all continue to reside in California. Respondent's Parents are senior citizens wishing to reunite with their son, and if given bond, plan to come to Concord California immediately to spend what time they have left with him.

F.  BEHAVIOR WHILE IN CUSTODY

Respondent has been cooperative and respectful to all staff throughout his incarceration and since he has been detained at Rio Cosumnes Correctional Center in Elk Grove California. He has been helping other detainees who do not speak very good English in filing forms and

educating them on the removal process and possible forms of relief. He has become a worker in his unit, helping with the cleaning duties, and has become the barber to the other detainees who need a haircut. Respondent keeps a positive attitude and outlook on his future and does not let his adversities affect his attitude and ultimate goal of starting a new life in the free world.

## V.   THE IMMIGRATION JUDGE RELIES ON A SUPREME COURT DECISION THAT RESPONDENT IS UNLIKELY TO PREVAIL ON HIS RELIEF FROM REMOVAL.

The Immigration Judge has identified his concerns that respondent is not likely to appear for removal if he is so ordered, and has noted more than once in his bond memorandum that the Supreme Court has rejected the argument that California's aiding and abetting is broader than the generic federal definition. *Gonzales v. Duenas-Alvarez,* 549 U.S 183 (2007). Respondent has always argued that *Duenas-Alvarez* introduced the *realistic probability* standard, holding that in order to find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires more than the application of legal imagination to a state statute's language. It requires a *realistic probability*, not a theoretical possibility, *that the State would apply its statute to conduct that falls outside the generic definition of a crime.* To show that realistic possibility, an offender, of course, may show that the statute was so applied in his own case. But he must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (non-generic) manner for which he argues. *Id.* at 193.

Respondent asserts that *his* case provides that "realistic probability" where the statute of his conviction did apply conduct that falls outside the generic definition of the crime. Respondent's case warrants a modified categorical approach, and even if the statute is found to not be divisible, the Court has the authority to go behind respondent's conviction by employing the *"realistic probability"* standard under *Gonzales v. Duenas-Alvarez,* 549 U.S. 183 (2007). This is a distinct threshold inquiry that a court may employ to identify the actual "minimum

conduct" criminalized by a statute. *Matter of Chairez-Castrejon*, 26 I&N Dec. 349 (BIA 2014) *id* at 357.

The fact that *this* Judge ordered respondent removed and the BIA dismissed his case finding his argument "unpersuasive" does not mean he doesn't raise serious concerns and valid questions of law that the Ninth Circuit has Jurisdiction to review. *Rodriguez* has recognized that the government does not dispute that some subclass members detained under §1225(b) and §1225(c) will win relief from removal, further undermining any purported rationale for continued detention. The preliminary injunction is necessary to ensure that individuals, such as the respondent here, whom the government cannot prove constitutes a flight risk or danger is not needlessly detained.

## A. CALIFORNIA'S POST CONVICTION RELIEF IN MURDER CASES INVOLVING THE NATURAL AND PROBABLE CONSEQUENCE DOCTRINE

The Immigration Judge further stated:

> …It is not hard to imagine a case in which there is a final order of removal but circumstances have changed such that respondent would have an incentive to appear. For example, if there has been a change in the law, or there has been post-conviction relief in a state court that makes it likely respondent will obtain relief from removal, such a person could, depending on the totality of the facts, have a case for release pending further proceedings. But that is not the situation here.

The Immigration Judge failed to recognize that there has been a change in California law since *Duenas-Alvarez*, which identifies the broad way in which California criminalizes aiders and abettors specifically in murder cases. In mid-2014, The California Supreme Court limited the natural and probable consequence doctrine by holding that a defendant can never be convicted of premeditated first degree murder on natural and probable consequence theory. *See People v. Chiu* 59 Cal. 4th 155 (2014). In *Chiu,* the defendant engaged in a street fight involving several youths and one was killed by gunshot. The defendant was charged with first degree murder under

the theory that he aided and abetted an "assault", and like the respondent, *Chiu* received a life term.

The California Supreme Court reversed and now prosecutors must rely on evidence to show that defendants who aid and abet had the *specific intent* to aid a premeditated murder. For first degree murder, the aiding and abetting must be *direct*- the connection between the defendant's culpability and the perpetrator's premeditation must not be attenuated. For first degree murder, the uniquely subjective and personal mental state required *cannot be manufactured* by the natural and probable consequence doctrine.

*Chiu* now defines California's aiding and abetting in two ways; with and without "intent." Respondent has provided evidence from his conviction that a Jury found him guilty of aiding and abetting with no intent or knowledge that the actual perpetrator was going to commit such a crime.

The Ninth Circuit has recognized that they do not defer to the BIA's interpretation of state or federal criminal statutes, because the BIA does not administer such statutes or have any special expertise regarding their meaning. *See Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1126 n.7 (9th Cir. 2006). The fact that the Immigration Judge does not think respondent has a chance in succeeding in terminating his removal proceedings is not supported by any case law where the facts of respondent's case are identical and warrants such opinion.

The situation here is, indeed there has been a new case law in California that allowed post-conviction relief for murder convictions that have been identified under the natural and probable consequence rule. This fact alone, identifies that respondent does have a stronger case fighting his removal pending further proceedings in the Ninth Circuit.

## VI.    CONCLUSION

For the foregoing reasons, the respondent respectfully requests this court to agree that an individualized bond hearing was not provided by a neutral decision maker pursuant to *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013), and that a heightened standard of proof that the respondent is a flight risk or danger was not supported by clear and convincing evidence from the government.

The Respondent asks this court to consider the evidence he has provided in support of a release under supervision by the State of California, or ankle monitoring, and set a reasonable bond to allow him to reunite with his family while his case is pending in the Ninth Circuit. Or in the alternative, remand this case back to an Immigration Judge who will conduct an *individualized* bond hearing as a neutral decision maker and will follow the procedures set forth in *Rodriguez*.

Executed on:&2of June, 2015                    Respectfully Submitted,

Cornelio Sales
Respondent
**Pro Se**

# Exhibit VI.

# Memorandum denying bond

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
SAN FRANCISCO, CALIFORNIA

Matter of )
)
**Cornelio Sales, Jr. aka Cornelius De** )
**La Cruz Salas** )
)
Respondent )
)
)

Date: April 28, 2015

File Number:  A 029 556 125

In Bond Proceedings

**MEMORANDUM**

The respondent has filed a motion for release on bond pursuant to *Rodriguez v. Robbins*, 715 F. 3d 1127 (9th Cir. 2013).   A hearing was held pursuant to that motion on March 25, 2015.

The respondent is a citizen of the Philippines who was admitted to the United States in 1989 as a lawful resident.   In 1995 he was convicted for second degree murder in violation of Cal. Penal Code Section 187 and sentenced to a term of 15 years to life in prison.   He was in state prison from 1995 until 2014.   Immediately after his release from prison he was detained by DHS and placed in removal proceedings.

Respondent filed no applications for relief.   Instead he filed a motion for a finding that he was eligible to apply for relief under former Section 212(c) of the Immigration and Nationality Act.   In a November 24, 2014 decision this court found that respondent was ineligible to apply for that relief because (1) his conviction for murder in violation of Cal. Penal Code Section 187 is categorically an aggravated felony, both under Section 101(a)(43)(A) and Section 101(a)(43)(F); (2) he served more than five years in prison; and (3) at the time of his conviction (December 8, 1995) the foregoing facts would have made him ineligible for Section 212(c) relief under the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978.

Respondent asserted that he may not have been convicted of generic murder, because California's doctrine of aiding and abetting is broader than the generic federal definition of aiding and abetting, and includes culpability for the "natural and probable consequences" of criminal acts.   This argument was rejected by the Supreme Court in *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007).

Respondent appealed to the BIA, and the Board dismissed his appeal on March 18, 2015. He then filed a petition for review with the Court of Appeals for the Ninth Circuit.

Respondent is married.   He has a stepson who is 14 years old.   His parents have legal status in the United States.   Respondent owns no property here and has never operated a business.   He has no assets of his own.   He testified that he has no fear of return to the

Philippines and that he wants to remain in the United States.   He also submitted multiple documents to show that he had rehabilitated himself in prison and is no longer a danger to society.

Respondent's wife testified that respondent is not a violent person, and that he was not violent in prison.   She pointed out that respondent entered the United States when he was five years old.   She also pointed out that she has a fixed address in the United States.   Respondent also called one of his former cellmates, who said that respondent is nonviolent, and a person of good character.   He said respondent helped get him "on track," and that he would employ and house respondent if he is released.

The government bears the burden in this proceeding to show by clear and convincing evidence that the respondent is a danger to the community, a risk of nonappearance, or both. However, "[a]n alien in removal proceedings has no constitutional right to release on bond. See Carlson v. Landon, 342 U.S. 524, 534 (1952). Rather, section 236(a) of the Act merely gives the Attorney General the authority to grant bond if he concludes, in the exercise of discretion, that the alien's release on bond is warranted."   Matter of Guerra, 24 I&N Dec. 37 (BIA 2006).

The court does not need to reach the question of whether the respondent currently presents a danger to others or not, because respondent is an acute risk of nonappearance and an exceedingly "poor bail risk."   Matter of Guerra, supra at 40.   In addition to his lack of assets and his lack of property ties, as noted above respondent has been ordered removed by this court and by the BIA.   The issue to be decided at present, then, is not whether the respondent will appear for future removal hearings, because he has no removal hearings scheduled.   The issue is whether he will report for removal if so ordered.

Ensuring that a respondent appears on his date of removal is a high priority of the federal government.   As the Supreme Court has said, the "basic purpose" for detention of aliens ordered removed is "assuring the alien's presence at the moment of removal."   Zadvydas v. Davis, 533 U.S. 678, 699 (2001).   The Board has recognized that Congress has been deeply concerned with the continued presence of criminal aliens in this country after they are ordered removed.   See Matter of Garvin-Noble, 21 I&N Dec. 672, 681 (BIA 1997).

In Matter of Rojas, the Board stated:

. . . Congress was frustrated with the ability of aliens, and particularly criminal aliens, to avoid deportation if they were not actually in Service custody when their proceedings were completed. See S. Rep. No. 104-48 (1995) (stating that many criminal aliens who are released pending deportation never appear for their proceedings, and that some criminal aliens abscond after being issued a final order of deportation); 141 Cong. Rec. S7803, S7823 (daily ed. June 7, 1995) (statement of Sen. Abraham); see also Ofosu v. McElroy, 98 F.3d 694, 702 (2d Cir. 1996) (stating that released aliens who abscond calculate correctly that the Service lacks the resources to conduct a dragnet). . . . Congress was not simply concerned with

2

> detaining and removing aliens coming directly out of criminal custody; it was
> concerned with detaining and removing all criminal aliens.

23 I&N Dec. 117, 122 (BIA 2001) (emphasis added).   As the Court of Appeals for the Ninth Circuit has noted, "most aliens who aren't in custody remain here long after their removal orders become final. *See, e.g.,* Office of the Inspector Gen., U.S. Dep't of Justice, *The Immigration and Naturalization Service's Removal of Aliens Issued Final Orders iii* (2003) (reporting that 'the INS removed only 3 percent of nondetained asylum seekers with final removal orders')." *Angov v. Holder,* 736 F.3d 1263, 1269 (9th Cir. 2013).

In *Matter of Ellis,* 20 I&N Dec. 641, 643 (BIA 1993) the BIA upheld a denial of bond pending the conclusion of deportation proceedings because "the immigration judge stated in his decision that the respondent is not statutorily eligible for any form of relief from deportation, which is a factor that contributes to the likelihood that the respondent will not appear for his deportation hearing." In *Matter of D-J-,* 23 I&N Dec. 572, 582 (A.G. 2003) the Attorney General reversed an immigration judge's decision to grant a bond, noting in part that "the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention."

Here, the concerns identified above are even more pronounced, because respondent's claim for relief from removal has been denied both by this court and the BIA, and he has been ordered removed.   As noted above, his only contention on appeal to the Ninth Circuit is a contention that has been rejected by the Supreme Court.

Facts cited by the respondent, such as his length of residence in this country, his desire to remain in the United States, and his family ties, tell us little, if anything, about whether he is likely to report for removal.   Indeed, these facts give him an incentive to *avoid* reporting for removal, because reporting for removal will permanently sever his connection to his family and this country.   Respondent has not failed to appear for any criminal or immigration proceedings, but that is because he has been continuously in custody since his 1995 murder conviction. On the facts of this case, whether the respondent can get a job in the future or whether he has a fixed address tells us little if anything about whether respondent will comply with his order of removal.

It is not hard to imagine a case in which there is a final order of removal but circumstances have changed such that a respondent would have an incentive to appear.   For example, if there has been a change in the law, or there has been post-conviction relief in a state court that makes it likely respondent will obtain relief from removal, such a person could, depending on the totality of the facts, have a case for release pending further proceedings.   But that is not the situation here.

3

The court finds that, under the specific facts of this case, the government has met its burden to show by clear and convincing evidence that respondent is a risk of flight and nonappearance, and that no condition or combination of conditions will reasonably assure his future appearance.

The respondent's motion for release on bond is denied.


**Anthony S. Murry**
**Immigration Judge**

4

# Exhibit VII.

# BIA bond dismissal

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

SALES, CORNELIUS DELA CRUZ
0/A029-556-125
RIO COSUMNES CORR.- RCCC
12500 BRUCEVILLE ROAD
ELK GROVE, CA 95757

DHS/ICE Office of Chief Counsel - SFR
P.O. Box 26449
San Francisco, CA 94126-6449

Name: SALES, CORNELIUS DELA CRUZ     A 029-556-125

Date of this notice: 9/17/2015

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

*Donna Carr*

Donna Carr
Chief Clerk

Enclosure

Panel Members:
Greer, Anne J.

Userteam: <u>Docket</u>

U.S. Department of Justice
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

File:  A029 556 125 – San Francisco, CA

Date:  SEP 17 2015

In re: CORNELIUS DELA CRUZ <u>SALES</u>

IN BOND PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:  Pro se

APPLICATION:  Change in custody status

The respondent appeals from the Immigration Judge's March 27, 2015, bond decision conducted pursuant to *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013).  The reasons for the Immigration Judge's bond decision are set forth in a bond memorandum dated April 28, 2015.[1] The parties do not dispute that the respondent is a class member included in the *Rodriguez* litigation.  The appeal will be dismissed.

We review Immigration Judges' findings of fact for clear error, but questions of law, discretion, and judgment, and all other issues, de novo.  8 C.F.R. §§ 1003.1(d)(3)(i), (ii).

After considering the relevant *Guerra* factors as well as the respondent's conviction for second degree murder in violation of Cal. Penal Code section 187, that he filed no applications for relief, and that the Immigration Judge's removal order has been affirmed by the Board, the Immigration Judge concluded that the respondent is a flight risk (Bond Memo at 1-4).  *See Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006) (affording the Immigration Judge broad discretion in considering factors that may be considered); *Matter of Ellis*, 20 I&N Dec. 641, 642 (BIA 1993); *see also Matter of D-J-*, 23 I&N Dec. 572, 582 (A.G. 2003).

Considering the procedural posture of the case along with the respondent's serious criminal history and lack of eligibility for relief, we agree with the Immigration Judge's determination that the Department of Homeland Security established by clear and convincing evidence that the respondent's continued detention is justified (Bond Memo at 4).  8 C.F.R. § 1003.19(d).

Accordingly, the following order will be entered.

ORDER:  The appeal is dismissed.

FOR THE BOARD

---

[1] The respondent also filed a motion to reconsider before the Immigration Judge on March 28, 2015, which was denied by the Immigration Judge on April 15, 2015.

# Exhibit VIII.

# Ninth Circuit Court Of Appeals order

FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

SEP 18 2015

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CORNELIO DELA CRUZ SALES JR., AKA Cornelio Dela Cruz Sales, AKA Cornelio De La Cruz Sales, AKA Jon Dela Cruz Sales, | No. 15-70885 |
| Petitioner, | Agency No. A029-556-125 |
| v. | ORDER |
| LORETTA E. LYNCH, Attorney General, | |
| Respondent. | |

Before: REINHARDT and RAWLINSON, Circuit Judges.

Respondent's motion to dismiss this petition for review for lack of jurisdiction is denied without prejudice to renewing the arguments in the answering brief. *See Nat'l Indus. v. Republic Nat'l Life Ins. Co.*, 677 F.2d 1258, 1262 (9th Cir. 1982) (stating that merits panel may consider appellate jurisdiction despite earlier denial of motion to dismiss).

Respondent's motion for summary disposition is denied because the questions raised by this petition for review are sufficiently substantial to warrant

ELF/MOATT

further consideration by a merits panel. *See United States v. Hooton*, 693 F.2d 857, 858 (9th Cir. 1982) (per curiam) (stating standard).

The motion for a stay of removal pending review is granted. *See Nken v. Holder*, 556 U.S. 418 (2009); *Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) (per curiam).

Upon review of the record, this court has determined that the appointment of pro bono counsel in this petition would benefit the court's review. The motion for appointment of counsel is granted. The court by this order expresses no opinion as to the merits of this petition.

The Clerk shall enter an order appointing pro bono counsel to represent petitioner for purposes of this petition only, and establishing a revised briefing schedule. The petition is stayed pending further order of this court.

# Exhibit IX.

# California Department of Corrections outcome evaluation report

## 4.5.2  Commitment Offense

Figure 8.  Three-Year Recidivism Rates by Commitment Offense



| Commitment Offense | Rate |
|---|---|
| Murder Second | 10.3% |
| Murder First | 15.8% |
| Vehicular Manslaughter | 31.9% |
| Marijuana Other [6] | 34.1% |
| Kidnapping | 38.3% |
| Driving Under Influence | 39.6% |
| CS Manufacturing | 41.4% |
| Attempted Murder Second | 47.0% |
| Manslaughter | 47.1% |
| Marijuana Possession For Sale | 48.1% |
| CS Possession For Sale [7] | 49.2% |
| Marijuana Sale | 49.4% |
| Lewd Act With Child | 50.3% |
| Rape | 52.8% |
| Forgery/Fraud | 52.8% |
| CS Sales | 53.8% |
| Penetration With Object | 55.8% |
| Sodomy | 57.1% |
| Arson | 58.0% |
| Grand Theft | 59.3% |
| Other Property | 60.0% |
| Robbery | 60.1% |
| Assault with Deadly Weapon | 60.2% |
| Other Offenses [8] | 61.9% |
| Burglary - First Degree | 62.7% |
| CS Other [9] | 62.8% |
| Hashish Possession | 62.8% |
| Other Assault/Battery | 62.9% |
| Burglary - Second Degree | 64.1% |
| CS Possession | 64.7% |
| Possession Weapon | 64.8% |
| Escape | 65.0% |
| Oral Copulation | 65.5% |
| Petty Theft With Prior | 67.9% |
| Receiving Stolen Property | 68.4% |
| Vehicle Theft | 72.5% |
| Other Sex Offenses [10] | 73.4% |

> The seriousness of an inmate's commitment crime is often inversely related to his/her recidivism risk.

[6] "Marijuana Other" offenses include planting, cultivating, harvesting, or processing marijuana; hiring, employing, using a minor in the unlawful transportation, sale, or peddling of marijuana to another minor; furnishing, giving, offering marijuana to a minor.

[7] CS is an abbreviation for "Controlled Substance."

[8] "Other Offenses" include false imprisonment, accessory, and malicious harassment.

[9] "CS Other" offenses include possession of CS in State prison; soliciting, encouraging, inducing a minor to furnish, sell, offer a CS; agreeing, consenting, offering to sell, furnish, and/or transport a CS.

[10] "Other Sex Offenses" include failing to register as a sex offender, unlawful sex with a minor, and indecent exposure.

Figure 8 and Table 9 show the top three highest three-year recidivism rates occur for inmates who were committed to a CDCR adult institution for other sex offenses, vehicle theft, and receiving stolen property (ranging from 68.4 to 73.4 percent). The lowest three recidivism rates occur for inmates committed to CDCR for vehicular manslaughter, first degree murder, and second degree murder (ranging from 10.3 to 31.9 percent). Note that recidivism rates were not calculated for categories with fewer than 30 inmate releases. In general, inmates committed for more serious crimes do not have higher recidivism rates. For example, 72.5 percent of inmates convicted of vehicle theft recidivate within three years, whereas 52.8 percent of inmates convicted of rape recidivate within three years.

There are wide differences in recidivism rates when examining commitment offense. Rates vary by as much as 63.1 percentage points. Second degree murder is the lowest at 10.3 percent and other sex offenses is the highest at 73.4 percent.

Comparison to the FY 2007-08 cohort shows declines in the FY 2008-09 cohort recidivism rates across most of the offenses. The largest overall decline was for kidnapping(-10.1 percentage points) and the largest overall increase was for sodomy (+16.7 percentage points).

# Exhibit X.

# Supporting documents related to rehabilitation

SUBSEQUENT RISK ASSESSMENT
FOR THE BOARD OF PAROLE HEARINGS
FORENSIC ASSESSMENT DIVISION
CALIFORNIA STATE PRISON – SOLANO (SOL)

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | Jon Sales |
| CDCR Number: | K04899 |
| DOB (Current Age): | 07/10/1976 *(current age: 37)* |
| Controlling Offense: | PC §187 Murder, 2nd Degree |
| | PC §12022(A) Use of Firearm |
| Date of Offense (Age at time): | 01/14/1995 *(Age at time: 18)* |
| Sentence: | 16 Years to Life |
| County of Commitment: | San Joaquin County |
| Date Entered into CDCR: | 05/02/1996 |
| Date Received at Current Institution: | 08/05/1997 |
| Placement Score: | 19 |
| MEPD: | 02/28/2009 |
| CDCR Forensic Evaluator: | Michael L. Venard, Ph.D. |

INMATE COPY

## II. SOURCES OF INFORMATION AND SCOPE OF FORENSIC ASSESSMENT

The current assessment serves as an update to the Forensic Assessment Division (FAD), Comprehensive Risk Assessment authored by Jatinder Singh, Ph.D. on 03/24/2010. The reader is respectfully referred to the FAD Comprehensive Risk Assessment for an overview of the inmate's background, opinions/conclusions related to violence risk potential, diagnoses, and related issues.

The inmate's Central File and Unit Health Record (UHR), subsequent to the clinical interview date of the Comprehensive Risk Assessment were reviewed and considered. The evaluator met with the inmate on 09/30/2013 and informed him that the interview was not confidential, that he had a right not to participate in the examination, and that a written report would be submitted to the BPH. He appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of his ability. Based upon the inmate's responses to the examiner's questions, it was the conclusion of the undersigned that it was not necessary to use auxiliary aids or services to achieve effective communication. A language interpreter was not needed. The undersigned evaluator reviewed the Disability and Effective Communications System (DECS) system, and 1073, which reflected high cognitive scores and no need for adaptive services (per CDATS; 03/26/2003). [1]

## III. CLINICAL INTERVIEW DATA

---

[1] FAD Comprehensive and Subsequent Risk Assessments are administered by licensed psychologists and reviewed by Senior Psychologist supervisors.

**MENTAL STATUS EXAMINATION:** Mr. Sales is a 37-year-old male who was alert and cooperative during the interview. He was well-oriented to person, place and time. He denied feeling depressed and he denied any recent or current experience of suicidal ideation. His mood was appropriate and stable throughout this interview. There were no behavioral indications of underlying agitation and he did not verbalize any aggressive or homicidal themes as he responded to interview questions. He maintained adequate eye contact at all times, and did not appear overwhelmed or distracted at any point. There is no self report indicating he has recently experienced auditory or visual hallucinations, and there was no evidence of delusions or paranoid ideations. Based on his verbal responses, his thinking was organized and he was able to express his thoughts in a coherent manner. His short- and long-term memory appeared intact as evidenced by his ability to provide clear and direct information to background-related questions. His rate and volume of speech were normal. There were no limitations in his vocabulary with respect to his ability to respond to any question or topic and his general intellectual ability appeared to fall within the average range.

**INSIGHT / SELF ASSESSMENT:** In a manner that was consistent with what he told Dr. Singh, Mr. Sales was able to describe the factors that once shaped his involvement within a group police described as a gang. He recalled the feelings of invincibility that he experienced knowing he had "backup" if needed and he said that feeling resulted in his failure to fully consider the potential consequences of his actions when he last lived in the free community. Mr. Sales said he learned to recognize the negative impact of his past social choices as he participated in various groups addressing violence prevention and gang alternatives. It is this writer's opinion Dr. Singh was clinically supported in the opinion that Mr. Sales "has a clear understanding of the circumstances that resulted in his becoming a member of the SBS street gang." His behavioral and vocational history within CDCR prior to the most recent Comprehensive Risk Assessment authored by Dr. Singh reflected well-developed self-awareness and behavioral control.

As noted below, there have been significant changes within his program status since the most recent Comprehensive Risk Assessment was authored. During this interview, Mr. Sales said he allowed his emotions to "get the best of me," and as such, he stopped thinking. He acknowledged he felt "overconfident" when he was granted a release date and as such, he failed to maintain prosocial control over his decisions resulting in his grant date being rescinded. He said he has been reminded of how quickly his life can change if he fails to remain vigilant and as such, is no longer willing to "let my guard down" and re-engage in negative or illicit behavior.

Because both of the disciplinary actions (detailed below) involved his wife, this writer asked Mr. Sales to discuss what he has learned about potential limitations within his plan to rely upon her to help him maintain prosocial behavior in the free community. He acknowledged "we both learned a lot" by having his release date rescinded, but he described his wife as a prosocial source of support. Instead, he said the fault was "mine" because he did not clearly communicate to her the potential consequences of his decisions/actions. He said he has since learned to have a greater perspective over his

decisions and he has been "strongly challenged" by other life term inmates to more carefully consider future behaviors.

INSTITUTIONAL PROGRAMMING:   Since the most recent Comprehensive Risk Assessment was authored, there have been significant developments. Specifically, Mr. Sales was granted parole at a hearing on 08/04/2010. He said he felt confident and was overwhelmed with positive emotions. He said he did not handle those overwhelming emotions correctly, however, and he made what he called a "poor decision" to use a cell phone. He was found guilty of cell phone possession on 10/06/2010. Based upon that finding, the Board scheduled a rehearing. Prior to that rehearing, Mr. Sales was found guilty of sexual activity in the visiting room with an adult (his wife) on 04/17/2011. He appeared before the Board on 04/29/2011 where his grant was rescinded and he was given a three-year denial.

Mr. Sales is a Level II inmate who has been at SOL since 1997. He has been certified with community-ready skills by the American Board of Opticianry Competency Examination and he has maintained his vocational assignment within PIA optical since 2002. As of this interview date, he said he is enrolled in Alcoholics Anonymous, Criminals and Gangs Anonymous (CGA) and an Insight workshop. He said his wife lives in Concord CA and visits weekly.

Since the most recent Comprehensive Risk Assessment was authored, this inmate has maintained a previously documented pattern of self-help participation. He has received Chronos for participation within classes sponsored by Passport to Purpose and the Islamic chapel. He has completed courses addressing self-esteem, dealing with difficult people and healthy relationships. He has received Chronos documenting has completion of anger management courses and self-reflection workshops. He completed a three-month formal Substance Abuse Program (SAP) in July 2011 and he has completed additional 12-step relapse prevention programming. Mr. Sales has competed programs sponsored by KATARGEO and he has completed college-level units via Lassen College. He has been commended for his donation to the American Cancer Society and he has been recognized for his efforts as a referee within the 2011 softball league. During calendar year 2013, he has been recognized for his sustained participation in AA and an advanced 12-step group. He has been a regular participant within a Personal Awareness program and he is recognized as a regular member of CGA. Most recently, he completed a domestic violence workshop in August 2013.

In sum, there is evidence he has maintained prosocial programming with no apparent reduction or alteration, in spite of his disciplinary history and related grant reversal. There are no additional disciplinary write-ups since 2011.

PAROLE PLANS IF GRANTED A RELEASE: Mr. Sales is subject to deportation back to the Philippines if granted release. He said he has extended family in that country and he has been told he has employment options within the Optical field. He has access to substance abuse relapse prevention programs in that areas as well. Updated support letters are reportedly pending.

These plans aside, Mr. Sales said he planned to challenge his deportation in a hearing. He said he would prefer to remain in California with his wife and her 12-year-old son from a prior relationship. He said he has offers of employment from Goodwill Industries and he hoped as well to find work within the Optical field. He said he has a letter of acceptance from Options House in Berkley as an alternative in the event he and his wife have more struggles than anticipated and he said he anticipated receiving additional job offers from a "Gang on Gang Violence Project."

Although this inmate does appear to have adequate sources of support in California or the Philippines, it is worth noting the probable stress associated with his pending deportation process. Specifically, Mr. Sales said he has no plan to violate USINS restrictions if he is deported and that his wife has told him she would leave California (and potentially her son) and accompany him to the Philippines if he is forced to return. If he is allowed to remain in California, he will be facing the adjustment to the free community as an adult at the same time he adjusts to living within a marriage with a documented history of under-estimating the degree to which his decisions can impact his freedom. He told this writer that the recent events noted above have served to elevate the awareness of both himself and his wife to the need for close scrutiny of their decisions and the need for outside supports.

LIFE CRIME: As noted by Dr. Singh in 2010,

"According to the Court of Appeals-Third District (filed 9-25-98), on 1-14-95 an argument involving SBS (Side by Side) member Romeo Marlang and someone named "A.J." began at a birthday party. Vilay Khounsiriwong and Mr. Sales were attending another party, when Vilay Khounsiriwong received a page. He told Mr. Sales that Marlang needed "back-up." Mr. Sales was carrying a .38 caliber revolver. The two left the party and picked up Vilay Khounsiriwong's cousin Kloi Khoonsrivong. Bori Fein was also in the car. The group drove up to the other party, which was just ending. Kloi Khoonsrivong was in the driver's seat and Bori Fein was in the front passenger seat. A teenage girl entered the car, sitting in the back seat between Mr. Sales and Vilay Khounsiriwong. The victim was identified by Kloi Khoonsrivong as possibly being involved in the earlier argument. Vilay Khounsiriwong held Mr. Sales' gun, while Bori Fein put the bullets in his mouth. Mr. Sales wiped off the bullets and loaded them in the gun. Vilay Khounsiriwong and Bori Fein exited their vehicle and approached the victim's car. Vilay Khounsiriwong stood approximately three feet from the driver's side of the car and shot Mr. Moreno several times. Vilay Khounsiriwong and Bori Fein then ran to the waiting car and the group drove away. They made several stops, at each Vilay Khounsiriwong discussed shooting the victim. Vilay Khounsiriwong was found guilty of First Degree Murder and sentenced to 29 years to Life. Mr. Sales and Kloi Khoonsrivong each received 16 years to Life after being found guilty of Second Degree Murder."

<u>INMATE'S UNDERSTANDING OF LIFE CRIME:</u>  During this interview, Mr. Sales said the account he provided to Dr. Singh in 2010 was accurate. He acknowledged his role in providing the gun used in the shooting, calling that decision a foolish act. He said he chose to go to the party because of his reliance upon those peers for feelings of invincibility and because he felt obligated to help another SBS member. His current account is consistent with the official documentation.

<u>REMORSE AND INSIGHT INTO LIFE CRIME:</u> Mr. Sales said he had no prior relationship with the victim but he expressed an awareness of how his (inmates) decision impacted the victim's family. He expressed a credible awareness of the factors that shaped his decisions at that time and he cited his own past fears of being seen as unwilling to be supportive when he said he now realizes he should not have been present in the first place. In sum, Mr. Sales expressed a clear understanding of the factors that shaped his involvement within the life crime. He acknowledged the justice within his prison term and he expressed no negative/antisocial attitudes as he discussed the life crime or what he has learned during this term.

## IV.   OPINIONS AND CONCLUSIONS REGARDING VIOLENCE RISK

The most recent comprehensive evaluation was authored by Dr. Singh on 03/24/2010. Based on the information available, Dr. Singh offered the following diagnostic opinion:

| Axis I: | 303.90 | Alcohol Dependency, without physiological dependence, In a Controlled Environment |
|---|---|---|
| Axis II: | 301.7 | Antisocial Personality Disorder |
| Axis III: | | Defer to physician. |

Using a combination of empirically validated instruments as well as a structured clinical interview, Dr. Singh offered the opinion Mr. Sales then posed a low risk of future violence in the free community, suggesting as well that his violence risk could increase if he returned to the use of intoxicating substances, associated with antisocial peers or possessed a weapon.

Since the most recent Comprehensive Risk Assessment, Mr. Sales has maintained self-help program participation and he has remained stably assigned within PIA Optical. He has received Laudatory Chronos commending his volunteer/donation efforts and within that context, his risk of future violence does appear mitigated by his expressed ability to maintain prosocial values/behavioral stability when he chooses to do so.

There is also however, a recently noted disciplinary history associated with his self-reported lapse in judgment that he exhibited shortly after receiving a grant date when he said he felt "over-confident." Against that backdrop, his current post-release plan includes primary support from his wife who he described as a naïve participant in both disciplinary incidents. According to Mr. Sales, she did not fully grasp the potential consequences of his decision to use a cell phone or engage in inappropriate sexual behavior within the visitor center. It must be noted that neither disciplinary write-up involved overt violence and his

wife has reportedly now committed to holding him accountable for his own decisions, saying she will no longer participate in illicit behaviors. Nevertheless, in light of the probable stress associated with his current post-release plans (detailed above) it does seem clinically reasonable to suggest his risk of future violence is potentially aggravated by his own recently-demonstrated poor decision making skills. Additional concerns are potentially related to the under-developed supports from those who are willing to insist he maintain prosocial stability.

Michael L. Venard, Ph.D., CA License # PSY-14645
Forensic Psychologist
Board of Parole Hearings / Forensic Assessment Division
California Department of Corrections and Rehabilitation

Approved by:

Teal Kozel, Psy.D., CA License # PSY 21923
Senior Psychologist, Supervisor
Board of Parole Hearings / Forensic Assessment Division
California Department of Corrections and Rehabilitation

**DATE APPROVED:**   10/21/13

2

3

---

2  Pursuant to California Administrative Code, Title 15, "The CDCR inmate appeal process does not apply to the psychological evaluations prepared by the Board's psychologists. In every case where the hearing panel considers a psychological report, the inmate and his/her attorney, at the hearing, will have an opportunity to rebut or challenge the psychological report and its findings on the record. The hearing panel will determine, at its discretion, what evidentiary weight to give psychological reports."

3  CONFIDENTIALITY NOTICE:  This communication with its contents may contain confidential and/or legally privileged information.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA).  If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

COMPREHENSIVE RISK ASSESSMENT
FOR THE BOARD OF PAROLE HEARINGS
FORENSIC ASSESSMENT DIVISION
CALIFORNIA STATE PRISON-SOLANO (SOL)

## I.  IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | Jon Sales |
| CDCR Number: | K-04899 |
| DOB (Current Age): | 7-10-76 (currently 33 years old) |
| Controlling Offenses: | PC§ 187, Murder 2nd Degree |
| | PC§ 12022 (A), Use of a Firearm |
| Date of Offense (Age at time): | 1-14-95 (18 years old at the time) |
| Sentence: | 16 years to Life |
| County of Commitment: | San Joaquin County |
| Date Entered into CDCR: | 5-2-96 |
| Date Received at Institution: | 8-5-97 |
| Placement Score: | 19, Medium A |
| MEPD: | 1-12-09 |
| CDCR Forensic Evaluator: | Jatinder Singh, Ph.D. |

## II. SOURCES OF INFORMATION AND SCOPE OF ASSESSMENT

Mr. Sales' Central File and Unit Health Record (UHR) were reviewed.  The information used to come to the following conclusions and clinical findings was based on a review of the inmate's C-File and UHR.  The reader is respectfully referred to the prior records for a full background and summary of the inmate's psychosocial background and history.  Although all of the available documents were reviewed in detail, for the sake of brevity and clarity, only summary information, as it pertains to the referral questions, is provided herein.

Mr. Sales was interviewed on 3-24-10.  Before starting he was informed that the interview was not confidential and that a report with the results of the assessment would be submitted to the BPH. The psychological report is one of many factors considered in determining parole suitability.  He appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of his ability.  For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist.

It was the conclusion of the undersigned examiner that it was not necessary to use auxiliary aids to achieve effective communication. Although English was Mr. Sales' primary language, he has lived in the United States since he was five years old and his command of the language is very good, thus a language interpreter was not needed. The undersigned evaluator reviewed the Disability and Effective Communications System (DECS) system, and 1073, which reflected high cognitive scores (3-26-03). In this respect, effective two-way, reciprocal communication was established by virtue of a series of questions by this evaluator and appropriate responses by the inmate, including the right to refuse to participate in his BPH psychological evaluation.  Mr. Sales was additionally able to acknowledge the options available to him relative to this report, as noted in the paragraph at

INMATE COPY

the conclusion of the report. This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate or as taken from the records.

## III. PSYCHOLOGICAL QUESTIONS TO BE ANSWERED IN EVALUATION

Mr. Sales was granted parole at his 8-14-09 hearing. However, this decision was reversed on 1-7-10 by Governor Schwarzenegger pursuant to PC 3041.2. The governor expressed concerns about Mr. Sales' lack of insight about: the life crime, his decision to join a gang and his substance dependency issues. In addition, the Governor expressed concern about Mr. Sale's inability to conform to prison rules, citing 128A counseling chronos received in 2002 and 2005. This updated psychological assessment will address the following specific issues:

1) The prisoner's violence potential in the free community.

## IV. BACKGROUND INFORMATION

Information related to Mr. Sales' psychosocial history was obtained from the Court of Appeals Third Appellate District (filed 9-25-98). Information cited in a psychological assessment authored by Dr. Starrett (10-14-07), was also reviewed as part of this evaluation. During this interview, Mr. Sales provided additional information that was included below.

CHILDHOOD/ADOLESCENCE:   Although Mr. Sales was born premature, there were no developmental delays noted in childhood and he experienced no significant health problems or traumatic events as a child. He was never involved in any counseling or other mental health treatment as a child. During this interview, Mr. Sales also described himself as generally well behaved as a young child, with no significant history of arson, running away, animal cruelty or sustained opposition prior to age 12. He also denied any physical, emotional or sexual abuse.

Prior to age 15, Mr. Sales had no known problems. His father was transferred to Stockton, California, and Mr. Sales was in a car accident. Prior to this he spent much of his spare time playing baseball. Following the accident, he was unable to play baseball and started spending time with a group of young men who were friends with his cousin. Eventually, he began skipping school and spent much of his time at an arcade at a local mall with this group. He also began drinking alcohol at this time. Because this group spent a great deal of time with each other, they began referring to themselves as "'Side by Side or SBS in the summer of 1993. From this point on, "we flaunted it, when we went to a party, we said 'Side by Side in the house'." He reported that the group did not start out as a gang, but more as a "party group." It was for this reason that he denied gang membership earlier in his incarceration. Although they did not follow some of the traditions associated with gangs (e.g. wear colors, have initiation rites or tattoos), as he matured he realized that this group actually lived by the principles and beliefs of other street gangs. Their primary principle was "be there for each other," which meant that the members could call on one another for support if necessary. He denied gang fights, more typically gang members would be called upon when there were disputes with other groups of young men, preventing their friends from assaults by other groups. Eventually, parties were held with peers and flyers announcing the parties would state which group could or could not attend. He indicated that by being identified with the SBS, "you belonged, you were somebody... everybody had a group in Stockton at the time. It wasn't like we were looking for trouble, we were just partying."

Mr. Sales reported that his first arrest was for Petty Theft when he was 15 or 16 years old (at the beginning of 10th grade). There were two incidents when he was detained by police, but only one shows up on his juvenile record. One incident involved him and friends taking wooden pallets from a construction site to use for bonfires. They were talked to by police and told to stop this activity. The other incident involved stealing five or six dollars from a partially open locker at school with a friend. The locker belonged to a classmate who he knew, but not well and the theft was reported a week later. However, because he already had problems with truancy at school, he was sent to a continuation school while his friends remained at the school. He stated that it was ambiguous whether he was expelled, or whether he withdrew from school "it was on the borderline."

Family History: Mr. Sales was born in Dagupan, a community in the Philippines. His family immigrated to the United States in 1982, when he was four or five years old. They originally settled in Oxnard, California but moved to Lemoore, California (near Fresno, California) when he was seven or eight years old, but only remained for a short time. The family finally settled in Alameda, California. His friends in Alameda were other kids whose parents were in the military. They played baseball together and got into minor trouble for breaking curfew. When he was 15 years old, his father was transferred once again, this time the family settled in Stockton, California. Mr. Sales was raised by both of his parents and was the youngest of three children. His father worked as a cook in the Navy and his mother was a certified nurse's aide and preschool teacher. Mr. Sales was living with his parents at the time of his arrest for the controlling offense. Although his parents and siblings are naturalized citizens of the United States, because of his age at the time of the controlling offense Mr. Sales was unable to attain US citizenship. There is currently a USINS hold on him from the Philippines (Warrant Number A29559125). He expects he will be deported when paroled, and has signed paperwork indicating his intention to return to the Philippines willingly upon parole.

While he was growing up Mr. Sales was not particularly close to either parent, but felt closer to his mother. Because he was the youngest, he believes she "spoiled" him by giving him whatever material objects he requested (clothes, shoes, game systems). He believes it was difficult for his mother when he decided to venture out on his own, which began after the family moved to Stockton. His relationship with his father was more difficult. Because his father was in the military, he believed the children should follow strict rules, especially curfews. This was a rule Mr. Sales broke often. His father would respond by grounding him or taking away his phone. He stated that his parents always framed these consequences as efforts to "protect" him rather than "punish" him. Mr. Sales soon learned that he should make requests through his mother to avoid his father's lectures. He also learned to approach his mother to intervene on his behalf and reduce the punishment he received, which sometimes worked. His parents remain married, and are now retired and living with his sister in Imperial Beach near San Diego, California.

Mr. Sales stated believing that there was a great deal of love and nurturing within his family, however he "pushed it away" after the move to Stockton. Mr. Sales stated that at this point his life began to get "complicated." Before this, his plan to play professional baseball was a clear goal for his life. After the move, he was unable to play due to injuries sustained in a car accident and his focus became a new group of friends and "partying." Attendance at these parties was important among his peers, because it offered them a sense of importance. At the time, it was important to him to feel included, and he did with this peer group, which "drew me more and more to that